JOHN MATITS, PLAINTIFF-RESPONDENT, v. NATIONWIDE MUTUAL INSURANCE CO., *ETC.*, DEFENDANT-APPELLANT.

ELIZABETH SLODZINSKI AND ANTHONY SLODZINSKI, PLAINTIFFS-RESPONDENTS, v. NATIONWIDE MUTUAL INSURANCE CO., *ETC.*, DEFENDANT-APPELLANT, AND ALLSTATE INSURANCE COMPANY, *ETC.*, DEFENDANT.

ALLSTATE INSURANCE COMPANY, PLAINTIFF-RESPONDENT, v. NATIONWIDE MUTUAL INSURANCE CO., DEFENDANT-APPELLANT.

Argued September 27, 1960—Decided December 5, 1960.

*Mr. Henry H. Rubenson* argued the cause for the defendant-appellant (*Messrs. Oppenheim & Oppenheim,* attorneys; *Mr. Daniel Oppenheim,* of counsel).

*Mr. Kent A. Losche* argued the cause for the defendant Allstate Insurance Company (*Mr. Charles C. Shenier,* attorney).

*Mr. Carl Gelman* argued the cause for the plaintiff-respondent John Matits (*Messrs. Gelman & Gelman,* attorneys).

*Mr. Leon A. Consales* argued the cause for the plaintiffs-respondents Anthony and Elizabeth Slodzinski.

The opinion of the court was delivered by

PROCTOR, J. This case concerns coverage under the omnibus clause of an automobile liability insurance policy issued by the defendant, Nationwide Mutual Insurance Co.

On October 26, 1956 an automobile owned by Mrs. Hilda Velasco and driven by Mrs. Betty Mae Hoerner collided with an automobile owned by Elizabeth Slodzinski and driven by her husband, Anthony Slodzinski, in which John Matits was a passenger. Matits and Elizabeth and Anthony Slodzinski instituted actions for personal injuries and property damage against Mrs. Hoerner and Mrs. Velasco. The actions against Mrs. Velasco were dismissed, it being agreed that Mrs. Hoerner was not the former's agent at the time of the collision. Trial of the consolidated actions against Mrs. Hoerner resulted in judgments in favor of Matits for $25,000, and in favor of Elizabeth and Anthony Slodzinski for $875 and $500 respectively.

At the time of the collision, Mrs. Velasco was the named assured in an automobile liability insurance policy issued by Nationwide and covering the automobile driven by Mrs. Hoerner. Under the terms of that policy, Nationwide extended coverage to Hilda Velasco, her spouse, and "any person or organization legally responsible for the use of the described automobile provided the actual use was with the permission of the policyholder or such spouse." This is the standard omnibus clause found in most automobile liability insurance policies. Mrs. Hoerner was covered under a similar policy issued by plaintiff Allstate Insurance Co., on another automobile but extending to occasional operation by her of a vehicle other than the one insured. Nationwide refused to defend Mrs. Hoerner on the ground that, in light of the circumstances under which she was driving the car at the time of the collision, she was not covered by the Velasco policy. Allstate defended Mrs. Hoerner and, after judg-

ment against her, paid $10,000, the full coverage of its policy, to Matits. Matits and the Slodzinskis instituted the present actions to collect from Nationwide the amounts outstanding on the Hoerner judgments. Allstate sued Nationwide for $972.80, the expenses incurred defending Mrs. Hoerner. These actions were consolidated for trial, and the amounts sued for are not in dispute.

Nationwide concedes that it was the primary insurer and that therefore, if its policy covered Mrs. Hoerner, it must pay all plaintiffs. The undisputed facts brought out at the trial are as follows:

The Velascos and Hoerners were next-door neighbors in Ramsey, New Jersey. On October 25, 1956, in the early evening, Mr. Velasco loaned his wife's car to Mrs. Hoerner so that she could visit her mother who was ill in Hawthorne, New Jersey. Mrs. Hoerner arrived in Hawthorne about 8:00 P. M. After a short visit with her mother, she drove in search of her sister to the Crane House, a tavern and restaurant in Paterson. At Hawthorne, Paterson is in the opposite direction from Ramsey. Mrs. Hoerner had a few highballs at the Crane House and then drove to the Flamingo Bar in Paterson. She stayed at the Flamingo for a short time, and then returned to the Crane House; she then paid a second visit to the Flamingo; and finally, a third visit to the Crane House. Just before midnight, she left the Crane House to drive home and, shortly thereafter, was involved in the collision with the Slodzinski car in Paterson.

Plaintiffs and defendant disagree as to the time limit imposed by Mr. Velasco on Mrs. Hoerner's use of the car, and the time and content of a telephone call made by Mrs. Hoerner to Mr. Velasco after her departure from her mother's house and before the collision. Velasco testified that when he gave permission to use the car he told Mrs. Hoerner to return it within an hour. Mrs. Hoerner testified that there was no time limit on her use of the car. She further testified that at about 11:00 P. M. she telephoned Velasco and told him that she was "going to be a little late" and asked

"would he mind if she kept the car a little longer," to which he replied, "Certainly; as long as * * * [she] returned the car before three o'clock that morning." Mr. Velasco testified that Mrs. Hoerner called about 9:30 P. M. and that upon being informed by her that she was going to stop and have a drink, he said, "* * * you better get right home because I need the car * * * your husband will be home soon and if he knows that you have been drinking you are going to get it."

The trial court, finding that Mr. Velasco had given initial permission to Mrs. Hoerner to use the car, held that Mrs. Hoerner was an additional insured under Nationwide's policy and that "the fact of [her] later deviation is unimportant." Accordingly, he deemed it unnecessary to resolve the above-mentioned factual issues and entered judgment for all plaintiffs. The Appellate Division unanimously affirmed, stating that "in the absence of a gross deviation from the permitted use the permittee will not be denied the benefit of the insurance to the detriment of the injured," and holding that "the trial court correctly concluded that Mrs. Hoerner's use of the Velasco vehicle did not so deviate from the permission granted to her as to deprive her of the coverage under the policy." 59 *N. J. Super.* 373 (1960). We granted Nationwide's petition for certification. 32 *N. J.* 350 (1960).

According to the terms of the omnibus clause in Nationwide's policy, Mrs. Hoerner was covered as an additional assured if her "use" of the Velasco car at the time of the collision was with the "permission" of Mr. or Mrs. Velasco. When Mrs. Hoerner left her mother's home in Hawthorne to drive to the Crane House and the Flamingo Bar in Paterson, she deviated from the purpose for which she borrowed the Velasco car. The question for decision is whether her deviation vitiated Velasco's initial permission so as to deprive her of coverage under defendant's policy. Courts faced with this question have adopted one of three views: (1) The liberal or so-called "initial permission" rule that if a person has permission to use an automobile in the first

instance, any subsequent use while it remains in his possession though not within the contemplation of the parties is a permissive use within the terms of the omnibus clause; for cases so holding, see Annotations 72 *A. L. R.* 1375, 1405–09 (1931); 106 *A. L. R.* 1251, 1262 (1937); 126 *A. L. R.* 544, 553–55 (1940); 5 *A. L. R. 2d* 600, 629–36 (1949); (2) the moderate or "minor deviation" rule that the permittee is covered under the omnibus clause so long as his deviation from the permissive use is minor in nature; Annotations 72 *A. L. R., supra,* at *pp.* 1401–03; 106 *A. L. R., supra,* at *p.* 1259; 126 *A. L. R., supra,* at *p.* 552; 5 *A. L. R. 2d, supra,* at *pp.* 636–43; and (3) the strict or "conversion" rule that any deviation from the time, place or purpose specified by the person granting permission is sufficient to take the permittee outside the coverage of the omnibus clause; Annotations 72 *A. L. R., supra,* at *pp.* 1403–05; 106 *A. L. R., supra,* at *pp.* 1260–62; 126 *A. L. R., supra,* at *pp.* 552–53; 5 *A. L. R. 2d, supra,* 626–29. For additional authorities discussing these rules, see 7 *Appleman, Insurance* 169–181 (1942); Putman, "The Standard Automobile Policy: What Persons and Which Vehicles are Covered," 11 *Ark. L. Rev.* 20 (1956–57); Ashlock, "Automobile Liability Insurance: The Omnibus Clause," 46 *Iowa L. Rev.* 84, 102–118 (1960).

The trial court and the Appellate Division in the present case both relied on *Rikowski v. Fidelity & Casualty Company,* 117 *N. J. L.* 407 (*E. & A.* 1937), to conclude differently as to the applicable New Jersey law. The trial court interpreted *Rikowski* as adopting the initial permission rule. Since Mr. Velasco undisputedly gave permission to Mrs. Hoerner to use the car in the first instance, the trial court, applying that rule, found that Mrs. Hoerner, without regard to the extent of her deviation, was an additional assured. The Appellate Division apparently interpreted *Rikowski* as adopting the minor deviation rule. It affirmed the judgments below, however, because it regarded the trial court as having found Mrs. Hoerner's deviation was not so gross as to deprive her of coverage under the policy. 59 *N. J. Super.,* at

*p.* 382. These divergent views of applicable New Jersey law understandably derive from ambiguity in the *Rikowski* holding. The facts in that case were these: A chauffeur drove his employer to a department store. There was no place to park in the immediate vicinity. The employer told the chauffeur to find a parking place and return within an hour. An accident occurred within a half hour about two miles from the department store while the chauffeur was driving some friends to their home. The court held that the omnibus clause in an insurance liability policy issued to the employer covered the chauffeur.

The nature of the deviation in *Rikowski* and the language of the Court of Errors and Appeals suggest adherence to the minor deviation rule. The deviation from the permissive use does not appear to have been gross and the court's conclusion was "that under the facts of the case and within the meaning of the policy such deviation from instructions as the evidence discloses did not serve to end the driver's permission to operate the car." On the other hand, the court in *Rikowski* relied primarily on *Dickinson v. Maryland Casualty Co.*, 101 *Conn.* 369, 125 *A.* 866, 41 *A. L. R.* 500 (*Sup. Ct. Err.* 1924), which is frequently cited as the leading case supporting the initial permission rule. See, *e. g., Garland v. Audubon Insurance Company*, 119 *So.* 2d 530, 539 (*La. Ct. App.* 1960); Annotations 126 *A. L. R., supra,* at *p.* 553; 5 *A. L. R. 2d, supra,* at *p.* 630; Note, 83 *U. Pa. L. Rev.* 765, at *p.* 768 (1935). But see *Ashlock, op. cit., supra,* at *p.* 106.

The facts in *Dickinson* in many respects resemble those in the present case. There an automobile was loaned so that the borrower could drive home to change his clothes. He was told to "hurry back." Instead of driving home, the borrower stopped in a saloon to get a drink. While there, he picked up some friends and while driving one of them home, in an opposite direction from the borrower's home, visited at least one other saloon for drinks. Shortly thereafter, the borrower was driving to a corner where he could

see the city hall clock in order to determine whether he still had time to drive to his home when the car struck a tree, killing one of the occupants. The issue before the court was whether the borrower was an additional assured under the owner's automobile liability policy. The court, construing an omnibus clause similar to the one in the present case, said [101 *Conn.* 369, 125 *A.* 868]: "Does this language mean the permission to use the car or the permission to use the car in a specified manner and for a specified purpose? These are the two constructions which confront us * * *." Following the well-established rule that the provisions of an insurance policy are construed strictly against the insurer, the court adopted the construction that permission to use the car in the first instance made the borrower an additional assured. The court rejected the construction that permission was circumscribed by the use of the car in a specified manner or for a specified purpose.

The citation in *Rikowski* of *Dickinson* suggest that our former Court of Errors and Appeals was adopting the initial permission rule. The *Rikowski* case has been so interpreted. See, *e. g., Konrad v. Hartford Accident & Indemnity Company,* 11 *Ill. App.* 2d 503, 137 *N. E.* 2d 855 (*App. Ct.* 1956); Annotation 5 *A. L. R.* 2d, *supra,* at *p.* 629; Miller, "The Omnibus Clause," 15 *Tul. L. Rev.* 422, 427, n. 34 (1941). And the rationale of the *Rikowski* decision reenforces such an interpretation. The court there noted that the *Motor Vehicle Financial Responsibility Law* then in effect, *P. L.* 1929, *c.* 116, *R. S.* 39:6–1 to 22, represented legislative adoption of a public policy "looking towards the collectibility of damages wrongfully inflicted in the operation of motor vehicles." To effectuate such legislative policy the court interpreted the omnibus clause broadly. Additionally, it noted that since automobile liability insurance contracts are written solely by the insurer and in face of the legislative purpose to benefit persons injured, such contracts are to be construed liberally in favor of the injured. See, *Costanzo v. Pennsylvania Threshermen, etc., Ins. Co.,* 30 *N. J.* 262,

at *p.* 268 (1959); *Eggerding v. Bicknell,* 20 *N. J.* 106, at *p.* 113 (1955). These reasons support the initial permission rule and are even more persuasive today. In 1952, the Legislature enacted a far more comprehensive scheme of motor vehicle legislation designed to assure that persons who cause automobile accidents are able to answer financially to their innocent victims. *Motor Vehicle Security-Responsibility Law, N. J. S. A.* 39:6–23 to 60; *Unsatisfied Claim and Judgment Fund Law, N. J. S. A.* 39:6–61 to 91; *Motor Vehicle Liability Security Fund Law, N. J. S. A.* 39:6–92 to 104. For a discussion of the genesis, operation, and purpose of these statutes, see Molnar, "New Jersey's Answer to Financially Irresponsible Motorists," 1955 *Insurance Law Journal* 729; Gaffney, "The Motorist, His Victim and The State," 25 *State Government* 266 (1952). A legislative policy so comprehensively implemented demands an even broader interpretation of the omnibus clause than the interpretation based upon the policy of the Legislature at the time of the *Rikowski* decision. The "initial permission" rule is based on a broad interpretation of the omnibus clause. *E. g., Dickinson v. Maryland Casualty Co., supra.* The "conversion" and "minor deviation" rules are based on narrower interpretations of the clause. *E. g., Johnson v. American Automobile Ins. Co.,* 131 *Me.* 288, 161 *A.* 496 (*Sup. Jud. Ct.* 1932); *Denny v. Royal Indemnity Co.,* 26 *Ohio App.* 566, 159 *N. E.* 107 (*Ct. App.* 1927). It is our view that these latter rules making coverage turn on the scope of permission given in the first instance render coverage uncertain in many cases, foster litigation as to the existence or extent of any alleged deviations, and ultimately inhibit achievement of the legislative goal. We think that the "initial permission" rule best effectuates the legislative policy of providing certain and maximum coverage, and is consistent with the language of the standard omnibus clause in automobile liability insurance policies.

██ Accordingly, we hold that if a person is given permission to use a motor vehicle in the first instance, any

subsequent use short of theft or the like while it remains in his possession, though not within the contemplation of the parties, is a permissive use within the terms of a standard omnibus clause in an automobile liability insurance policy. Mr. Velasco gave Mrs. Hoerner permission to use his wife's automobile to visit her mother. Velasco's initial permission made Mrs. Hoerner an additional assured and her subsequent deviation from the purpose for which she borrowed the vehicle did not annul the protection afforded her and the injured plaintiffs by the omnibus clause of Nationwide's policy.

Our holding is not contrary to *Nicholas v. Independence Indemnity Co.*, 11 *N. J. Misc.* 344 (*Sup. Ct.* 1933); *Penza v. Century Indemnity Co.*, 119 *N. J. L.* 446 (*E. & A.* 1938) and *Baesler v. Globe Indemnity Co.*, 33 *N. J.* 148 (1960). Without expressing approval or disapproval of *Nicholas* and *Penza,* it is sufficient to say that these cases are entirely inapposite to the question here presented. Neither involved a deviation from a permitted use. Both had to do with a retaking of an automobile after permission to use it had expired—a retaking which the court in *Penza* characterized as unlawful. In both cases the court found that there was no permission to use the automobile in the first instance. Indeed, the court in *Penza* took pains to emphasize this fact as a ground for distinguishing the case from *Rikowski.* It said: "We do not regard this as a case involving an initial permission to use an automobile and a 'slight,' or any other kind of deviation therefrom." *Penza, supra,* 119 *N. J. L.,* at *p.* 451. The court went on to say that if the driver had deviated from a permitted use there might well have been coverage under *Rikowski.* *Baesler* is also readily distinguishable from the present case. There we held that coverage did not extend to a person who was expressly prohibited by the named insured from using the automobile. The case did not involve deviation from an initially permitted use.

Affirmed.

HALL, J. (dissenting). The sweeping adoption by the majority of the "initial permission" rule as the criterion for construction and application of the omnibus clause deeply overshadows the question of who should win this case.

The simple words, perhaps too simple, "actual use * * * with the permission" of the policyholder or named assured, found in substantially similar form in practically all automobile liability policies issued in every jurisdiction save compulsory insurance states, have engendered probably as much reported litigation as any common contractual phrase. The absence of an express definition of the key words, either legislatively or within the instrument, coupled with the infinite variety of factual situations arising, has resulted in the widest conceivable range of judicial approach, reasoning and result. Although classification is generally attempted on the basis of the three rules, the points of difference among the states do not clearly emerge. Indeed, in some instances cases in a given jurisdiction seem inconsistent with each other and the differing treatment of factual situations frequently defies logic. See the latest compendium and classification of the cases in Ashlock, "Automobile Liability Insurance: The Omnibus Clause," 46 *Iowa L. Rev.* 84 (1960). Generally speaking, the differing rules and results may be said to derive from varying judicial views of the public policy conceived to be involved. The "initial permission" rule, with the extreme results it dictates, rests upon such a broad conception of policy that a shift to it, or indeed its adoption in the first instance, should come only from the Legislature, which alone can properly determine its desirability and control its ramifications. See Appleman, "Special Phases of the Omnibus Clause in Insurance Policy," 22 *A. B. A. J* 613, 648 (1936); Eaton, "Problems Presented by Liberal Interpretations of Omnibus Clauses," 6 *Am. U. L. Rev.* 47, 50 (1957).

Until such a determination comes, it seems to me that the rule is an unjustifiable basis for the interpretation of the present omnibus clause. First, it interferes with an essentially

private contract by what amounts to torturing the language of the parties. Second, and perhaps more important, it is at variance with and represents a judicial extension of a well defined legislative scheme in this State relating to recompense of innocent accident victims and the place of insurance therein which stops well short of the scope imposed by this decision.

The theory of the clause is that the insurer, in the exercise of its freedom to contract with a particular vehicle owner or not, initially selects its risk and the extent of it and permits that risk to be extended only by the insured upon whom it relies to entrust and delegate use and operation to responsible persons. While it is unusual to permit one party to a contract unilaterally to extend its benefits to others, reliance for protection of the insurer's interest is placed on the personal interest of the named assured in desiring to be as certain as possible that his vehicle will not be damaged or cause injury to third persons and that he will not become subject to a law suit occasioned by another's operation of his vehicle, with its attendant inconvenience and notoriety, even though he knows his insurance carrier will defend and indemnify him. Although the theory has its practical flaws, nonetheless the insurer has selected this basis and is entitled to stand on it and be basically protected in it, absent the exercise of supervening governmental action. Certainly the intended frame of reference should not be altered to whether, as a matter of hindsight, the insured desired his permittee to have policy protection. Compare dissenting opinion in *Baesler v. Globe Indemnity Co.*, 33 *N. J.* 148, 156, 157 (1960).

To hold, as the majority does here, that, given permission to use a motor vehicle in the first instance, any subsequent use while it remains in his possession, "short of theft or the like," though concededly not within the contemplation of the parties, is a permissive use, does grave violence to the policy language. *"Actual* use * * * with the permission of the policyholder" to me connotes the precise use at the

time of the accident. "Use" to be meaningful in the context, from the standpoint of both the owner and the insurer, must encompass in some way the elements of time, place, purpose and operator. It clearly means more than initially permitted possession. Even if the owner had absolutely prohibited the purpose for which the car was being used at the time of the accident, coverage would now seem logically to be nonetheless imposed. The "initial permission" rule makes the permittee the sole judge of the extension of the risk, rather than the assured by whom the insurer measured its risk and fixed its premium charge. See Eaton, *supra* (6 *Am. U. L. Rev.* 47). It is very close to saying that liability insurance must, irrespective of and contrary to the agreement of the contracting parties, cover the vehicle unless the driver be a thief. So I believe it only consistent to suggest that the theory of the dissent in *Baesler* (33 *N. J.*, at *p.* 156) must be said to have become the law of New Jersey in less than six months.

The majority principally justifies the adoption of the rule on the basis of policy derived from our statutes concerning financial responsibility for the operation of motor vehicles. The opinion puts it this way: "We think that the 'initial permission' rule best effectuates the legislative policy of providing certain and maximum coverage, and is consistent with the language of the standard omnibus clause * * *." In my view this conclusion is unjustified when the statutory scheme and the very provisions of the law are carefully considered. The Legislature might well have gone as far as the majority does, but since it most certainly did not, it is beyond the province of the judicial branch to do so.

In the first place, New Jersey does not require any form of insurance as an initial condition for the operation of a motor vehicle nor does it insist where insurance is in force that such coverage shall be all-inclusive. The whole scheme of the law rests upon the concept of individual ability of the owner or operator to respond in damages where he may be liable and not upon any theory that there must be some

insurance source of payment to an accident victim no matter who may be driving the vehicle involved. The majority shifts the scheme to the latter theory by enlarging the legislative policy.

Our security-responsibility law of 1952, akin to that in most states, provides in effect that where a driver has violated certain provisions of the laws concerning the operation of a vehicle (whether an accident be involved or not) or has failed to satisfy a judgment against him resulting from a prior accident, his operator's license and all owner's vehicle registrations shall be and remain suspended until he furnishes proof of financial responsibility for future accidents (and satisfies any past judgments). *N. J. S. A.* 39:6–31, 32 and 35. A permitted and the commonly used form of proof of such responsibility is a liability insurance policy in specified minimum amounts. *N. J. S. A.* 39:6–40 and 46. And, most important, such an owner's policy specifically need only "insure the insured named therein and *any other person using or responsible for the use of any such motor vehicle with the express or implied consent of the insured.* * * *" (emphasis added). *N. J. S. A.* 39:6–46(*a*). It cannot properly be disputed that this language, which is the only provision in our law requiring a liability policy to contain any omnibus clause at all, goes no further in legal effect than the standard clause.

The 1952 legislation contained two additional features. The first provides for the suspension of the license of each operator and all registrations of each owner of a vehicle in any manner involved in an accident, prior to any determination of liability or entry of a judgment, unless the operator or owner involved deposits security with the Director of the Division of Motor Vehicles in an amount determined by him to be sufficient to satisfy any judgment for damages. The requirement is not applicable if there is a liability insurance policy in effect and, again most significantly, as to the owner, if the vehicle *"was being operated without his permission, express or implied* * * *."* (Emphasis added.)

502

N. J. S. A. 39:6–25 and 26. Obviously we have the same concept of coverage as that specified under the responsibility sections previously outlined and I fail to see therein any inferable declaration of policy warranting disregard of the plain incidents of "permission."

The statutory scheme is rounded out by the Unsatisfied Claim and Judgment Fund, N. J. S. A. 39:6–61 to 91, also enacted in 1952. The feature is peculiar to this State. It provides in general for the payment of claims and judgments of injured persons, in case there is no applicable insurance, to the same maximum extent as the minimum limits of coverage specified where the security and financial responsibility law is applicable. Although at least one purpose of the latter law is to encourage voluntary procurement of liability insurance on pain of license and registration suspension if certain untoward events occur, it is equally clear that the fund is intended to fill the gap as far as the injured party is concerned where there is no insurance or where the contract does not cover. Note N. J. S. A. 39:6–65(b). It is therefore especially difficult in New Jersey to say that the omnibus clause should be so broadly construed in order to assure innocent accident victims of compensation. It seems evident that the Legislature has selected its method for protecting the innocent victim where the driver is uninsured. By extension of the omnibus clause the majority has shifted a substantial portion of the burden of compensating the unfortunate victim from the unsatisfied judgment fund where it was placed by the Legislature to the private carrier, and that by disregard of the limits of the latter's contractual obligation. This is not a promotion of the legislative scheme, but rather an improper alteration thereof. Cf. Buzzone v. Hartford Accident & Indemnity Co., 23 N. J. 447 (1957); American Casualty Co. v. Cioffi, 49 N. J. Super. 6 (App. Div. 1958).

It is sometimes said (e. g., Rikowski v. Fidelity and Casually Co., 117 N. J. L. 407, at p. 411 (E. & A. 1937); cf. Baesler, dissenting opinion, 33 N. J., at p. 157) that the

insurer cannot complain of a judicial extension of the clause because it chose the words and could have narrowed its obligation by more precise and restrictive language. This is an unrealistic thought in the light of the previously discussed statutes. Where a policy is written after an event in order to satisfy the financial responsibility provisions of the law, the omnibus clause expressly cannot be narrower than that specified in the statute (*N. J. S. A.* 39:6–46(*a*)) and will be held to include the statutory language anyway, even though the contract was written without any demand by the Director. *Saffore v. Atlantic Casualty Insurance Co.,* 21 *N. J.* 300 (1956). And certainly every policyholder desires and intends that his contract will make it unnecessary to post security, in the event his vehicle is involved in an accident, to prevent the suspension of his operator's license and registration. Since provisions requiring security are only inapplicable if the operation at the time was without his express or implied permission, he must have a policy which covers the vehicle if the operation is with his permission. Consequently it seems unlikely that an insurer could successfully sell contracts written more narrowly.

The "initial permission" rule has never met with great favor. Although precise labelling is difficult, it appears to be followed today in only five or six voluntary insurance states at the most, principally Illinois and Louisiana. New Jersey seemingly is the only recent convert. An early case in Tennessee, *Stovall v. New York Indemnity Co.,* 157 *Tenn.* 301, 8 *S. W.* 2d 473, 72 *A. L. R.* 1368 (*Sup. Ct.* 1928), and one in Connecticut, *Dickinson v. Maryland Casualty Co.,* 101 *Conn.* 369, 125 *A.* 866, 41 *A. L. R.* 500 (*Sup. Ct. Err.* 1924), are generally cited as the foundation stones of the doctrine. It is at least interesting to note that Tennessee has backed away substantially (see *Young v. State Farm Mutual Automobile Insurance Co.,* 244 *F.* 2d 333, 335–336 (4 *Cir.* 1957) and state court decisions cited therein) and that Connecticut, now an express adherent of the minor deviation rule, has directly held that *Dickinson* never did

stand for anything more. *Mycek v. Hartford Accident and Indemnity Co.*, 128 *Conn.* 140, 20 *A. 2d* 735 (*Sup. Ct. Err.* 1941). See *Ashlock, supra*, 46 *Iowa L. Rev.*, at *p.* 106.

I think it quite clear that until the case at bar New Jersey followed the so called "minor deviation" rule. I so understood the opinion in *Costanzo v. Pennsylvania Threshermen etc. Insurance Co.*, 30 *N. J.* 262 (1959) where we said (at *p.* 269) "* * * the trip to Passaic was not such a deviation as would serve to terminate the son's permissive use of the car." The majority now decides that *Rikowski, supra* (117 *N. J. L.* 407), though admittedly a minor deviation case on its facts, adopted the "initial permission" rule. As they point out, some commentators have thought so; another has reached the opposite conclusion. See *Ashlock, supra*, 46 *Iowa L. Rev.*, at *p.* 108, n. 138. But it appears to me, in the context in which and at the time when the problem in *Rikowski* arose, the court cannot be thought to have spoken in terms of anything but the minor deviation doctrine. Our only preceding case dealing with this aspect of the omnibus clause was *Nicholas v. Independence Indemnity Co.*, 11 *N. J. Misc.* 344 (*Sup. Ct.* 1933), where an employer had entrusted his truck to an employee to store in the latter's yard until again needed for business purposes and the latter used it for a personal errand in the course of which an accident occurred. The court found no permission and consequently no coverage. In *Rikowski*, the trial judge had held *Nicholas* controlling and decided for the insurer. Confronted with only this one precedent and an entirely different set of facts in which coverage seemed indicated, the real problem was to distinguish *Nicholas*. To me there is nothing in the opinion to indicate the court was actually doing anything more than deciding the factual situation before it to be a minor deviation.

This conclusion is borne out by the decision, subsequent to *Rikowski*, in *Penza v. Century Indemnity Co.*, 119 *N. J. L.* 446 (*E. & A.* 1938), where the facts were legally analogous to those in *Nicholas*. The plaintiff sought to hold the in-

surer on the theory "that the initial permission to use the car invokes the protection afforded by the 'omnibus' clause" (119 *N. J. L.*, at *p.* 451), citing *Dickinson* (before it was repudiated in Connecticut) and *Stovall*. The court rejected the argument and held for the defendant. If the "initial permission" rule had been adopted by *Rikowski*, it seems the result would have had to have been opposite in *Penza*, for such was the holding in *Stovall* in a similar factual pattern and is generally the outcome today in true "initial permission" states, even where the employee is expressly prohibited from using for personal purposes the business vehicle entrusted to him by his employer. *Konrad v. Hartford Accident & Indemnity Co.*, 11 *Ill. App. 2d* 503, 137 *N. E. 2d* 855 (*App. Ct.* 1956) ; see *Ashlock, supra,* 46 *Iowa L. Rev.*, at *p.* 113. In the light of the basic concept and overriding policy grounding the majority opinion, it appears impossible soundly to contend that *Nicholas* and *Penza* can still stand.

Moreover, I fail to see the continued efficacy of the basis of decision in our second permittee cases. *Costanzo, supra* (30 *N. J.*, at *pp.* 269–270) ; *Cronan v. Travelers Indemnity Company,* 126 *N. J. L.* 56 (*E. & A.* 1941). It would now seem unnecessary, once permission to the original permittee is established (that permission being judicially held to be unrestrictable), to be concerned with whether the owner impliedly permitted or expressly prohibited operation by a third person. There appears to be no real difference in principle between a deviation where a neighbor borrows a car for the expressly limited purpose of visiting her sick mother and then proceeds on a round of taverns and one where a friend is given the use of a car and allows someone else to drive it. If initial permission is to suffice, there should be no need to resort to the extensive reasoning employed in *Costanzo*. Equally by logic, the result in *Baesler* (33 *N. J.* 148), where a second permittee was expressly prohibited, ought also to fall, despite the protestation of the majority to the contrary. (Quite illogically, however, not even a

most liberal state appears to have found carrier liability in this situation. *Cocos v. American Automobile Insurance Co.,* 302 *Ill. App.* 442, 24 *N. E.* 2d 75 (*App. Ct.* 1939)).

The "minor deviation" rule, followed in the majority of jurisdictions, seems to me to be the only sound one so long as the extent of coverage is allowed to be governed by the unilateral act of the insured and the standard omnibus clause is permitted by the appropriate supervising authority. Prohibitions and restrictions as to use in all its elements are thereby regarded in accordance with the contract and not cast aside. I would, however, recognize such only where they amount to more than a mere admonition and the assured primarily had in mind the risk of accident. Those having some other basis, such as family discipline or personal convenience of the owner, should not be given controlling effect. Absent applicable prohibition or restriction, coverage would depend, objectively, on the use at the time having some connection with that permitted and not being so grossly different that it could be unquestionably said the owner would have prohibited it had he been expressly advised. All situations can be fairly determined on this basis. Due attention is then paid to intention of the parties, the scope of legislative policy to date and our prior case law.

As far as the case at bar is concerned, the conflicting evidence has never been resolved or determined. On one possible evaluation of the proofs, a substantial deviation as to purpose could be found. On another view, sufficient permission for the use preceding and continuing at the time of the accident might be determined to have been given. I would reverse the judgment of the Appellate Division and remand the cause to the trial court for a fact finding and redetermination on the basis of the views here expressed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5.

*For reversal*—Justice HALL—1.