284 N.J. Super. 117 (1995)
663 A.2d 1365
LORRAINE AINSWORTH, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
STATE FARM MUTUAL INSURANCE COMPANY, DEFENDANT-RESPONDENT/CROSS-APPELLANT, AND PRUDENTIAL PROPERTY & CASUALTY COMPANY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 1995.
Decided September 8, 1995.
*118 Before Judges STERN, KEEFE and HUMPHREYS.
John S. Hoyt, III argued the cause for appellant (Hoyt & Smith, attorneys).
John Burke argued the cause for respondent Prudential Property & Casualty Company (Berlin, Kaplan, Dembling & Burke, attorneys).
Sean M. Dillon argued the cause for respondent/cross-appellant State Farm Mutual Insurance Company (Melli & Wright, attorneys).
Peter A. Olsen argued the cause for amicus curiae New Jersey Automobile Full Insurance Underwriting Association (Francis & Berry, attorneys; Hugh P. Francis, of counsel; Mr. Olsen, on the brief).
Deborah T. Poritz, Attorney General of New Jersey, attorney for amicus curiae New Jersey Commissioner of Insurance (Joseph L. Yannotti, Assistant Attorney General, of counsel; B. Stephen Finkel, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Two issues are presented on this appeal: 1) whether a motor vehicle insured by the New Jersey Automobile Full Insurance Underwriting Association (JUA) is uninsured in the context of N.J.S.A. 17:28-1.1, thereby permitting plaintiff to proceed directly *119 against her uninsured motorist (UM) carrier rather than wait for payment under the JUA deferral plan; and 2) if the first issue is resolved against plaintiff, whether her insurer is obligated to arbitrate plaintiff's underinsured motorist (UIM) claim before the tortfeasor's liability limit for bodily injury is offered in settlement or paid by judgment. We conclude for the reasons stated herein that the JUA is an insolvent insurer in the context of N.J.S.A. 17:28-1.1(b), and, although the second issue is rendered moot by our conclusion on the first issue, we hold that UIM insurance carriers are not compelled to arbitrate until the conditions set forth in Longworth v. Van Houten, 223 N.J. Super. 174, 538 A.2d 414 (App.Div. 1988) are satisfied.
The facts are undisputed. Plaintiff Lorraine Ainsworth was involved in an automobile accident on February 2, 1990, when her vehicle was struck by a vehicle operated by Quey Cooper. Cooper was insured under a policy issued by the JUA through one of its servicing carriers with a combined single bodily injury limit of $50,000. At the time of the accident, the vehicle operated by plaintiff was insured by defendant State Farm. She also had non-owned vehicle coverage under a family auto insurance policy issued by defendant Prudential.
Plaintiff filed a complaint against Cooper in the Law Division on June 26, 1991. Summary judgment has since been entered against Cooper on the issue of liability. At the present time, injured claimants who either settle or obtain judgments against JUA insureds must wait up to eighteen months for their money. See N.J.S.A. 17:33B-3b(2); N.J.S.A. 11:3-2A.
Plaintiff maintains that it is unfair to make claimants, such as herself, wait for their just compensation, and that the Legislature has established a statutory scheme to prevent such an unjust result. That statutory scheme, according to plaintiff, is found in N.J.S.A. 17:28-1.1(e)(2)(b), which permits an insured claimant to pursue a UM claim against his or her insurer where the tortfeasor's insurer "is unable to make payment with respect to the legal liability of its insured because the insurer has become insolvent or *120 bankrupt, or the Commissioner of Insurance has undertaken control of the insurer for the purpose of liquidation[.]"
Consequently, in September 1993, plaintiff filed a complaint and order to show cause in the Law Division seeking to compel State Farm and Prudential to arbitrate her alleged UM and UIM claims.[1] After receiving briefs and entertaining oral argument, the Law Division held that plaintiff could not pursue the UM claim because JUA was not an insolvent insurer within the context of N.J.S.A. 17:28-1.1(e)(2)(b), but did have a right to pursue the UIM claim and ordered that arbitration to proceed. Plaintiff appeals from the Law Division judgment denying her request for UM arbitration, and defendant State Farm cross-appeals from that part of the judgment ordering UIM arbitration.[2] The JUA was not a party to the Law Division action but was granted leave to file an amicus curiae brief on the issue of whether Cooper is uninsured in the context of N.J.S.A. 17:28-1.1(e)(2)(b). At our invitation, the Commissioner of Insurance (Commissioner) has also filed an amicus curiae brief.

I
Plaintiff argues that the JUA is insolvent, under any recognized definition of the term, because of its huge deficit and the fact that it is paying settlements and judgments on a deferral basis through a trustee. She maintains that this conclusion is not only legally correct, but is an equitable result for deserving claimants. Plaintiff posits that if the UM carriers[3] pay her UM claim, they will be subrogated to her rights against the JUA insured, and ultimately will recoup the money they pay her on the *121 UM claim through settlement or judgment. The practical effect is that the UM carriers rather than plaintiff will have to abide the deferral period for the money the JUA justly owes.
Although the JUA is unable to point to any negative impact on it or its operation resulting from an adjudication that it is insolvent, it maintains that it is not insolvent, and also argues that the Commissioner has not undertaken control for the purpose of liquidation. The Commissioner essentially adopts the position taken by the JUA. Although the Commissioner contends that an adjudication that the JUA is insolvent may have precedential impact on the MTF, the JUA's residual market successor, he fails to identify any adverse consequence of such a determination in the context of a UM claim presented pursuant to N.J.S.A. 17:28-1.1(e)(2)(b).
The practical impact of plaintiff's argument, as we see it, is on open market UM carriers. Plaintiff maintains that the impact is minimal in view of the fact that a UM insurer will be subrogated to a plaintiff's claim and receive full reimbursement. Plaintiff appears to be correct in her contention that UM insurers will be able to present subrogated claims against JUA. Nothing in the Fair Automobile Insurance Reform Act of 1990, N.J.S.A. 17:33B-1 et seq., (FAIRA), or the pertinent regulations, prohibits the presentation of a subrogated claim, and neither the JUA, the Commissioner, nor the UM insurers have argued to the contrary. Thus, the UM insurers in this litigation, and in similar cases, will have an advantage that they would not have had had the JUA bailout been accomplished in the typical manner, i.e., where the Commissioner institutes formal proceedings to have an insurer declared insolvent. In the typical case, a UM insurer may not present a subrogated claim for reimbursement to the New Jersey Property Liability Guaranty Association (Guaranty Association). N.J.S.A. 17:30A-5d.[4]
*122 However, plaintiff's argument is not complete in terms of the practical impact a decision in her favor will have on UM insurers. While it is true that the UM insurers are subrogated to plaintiff's rights if they pay plaintiff's UM claim, they are not entitled to a dollar for dollar return of their money as a matter of law. The JUA is not bound by the arbitration proceedings between plaintiff and the UM insurers, and may take the position that the value of plaintiff's claim is substantially less than that awarded to plaintiff in the UM arbitration. If that occurs, the UM insurers may be forced to litigate the subrogated claim against the JUA in the pending civil suit, unless they are willing to accept from the JUA an amount less than they paid through arbitration.
Several scenarios may flow from this result. Most UM endorsements allow either party to reject the arbitrators' damage award if the amount of the award exceeds the statutory minimum liability insurance limit. See Cohen v. Allstate Ins. Co., 231 N.J. Super. 97, 555 A.2d 21 (App.Div.), certif. den., 117 N.J. 87, 563 A.2d 846 (1989) (upholding the legality of such clauses). Thus, a UM insurer, faced with the prospect of litigating the value of a plaintiff's damage claim against the JUA, will undoubtedly elect not to accept the award as final unless it can obtain JUA's acknowledgement that the award represents the fair value of plaintiff's claim. That is the best case scenario.
Alternatively, JUA may refuse to acknowledge that the award represents the true value of the claim, in which case the UM carrier will reject the arbitration award and request a plenary trial. In that case a plaintiff will become involved in a plenary trial, thereby losing the benefit of the expedited arbitration proceeding. However, in this second scenario, the plenary trial can involve both the UM carrier and JUA, and both will be bound by the result. The UM carrier will be required to pay the judgment *123 promptly under the UM provision of its policy, and JUA will be obligated, in due course, to reimburse the UM carrier on its subrogated claim.
A third scenario occurs when the UM coverage is the statutory minimum. In such cases, the UM insurer is bound by the arbitration award. Cohen, supra. If JUA does not recognize the award as representing the fair value of the claim, the UM insurer will be required to litigate the damage award against JUA. However, the insured will be required to cooperate with the UM insurer in prosecuting the claim.
In any case, the UM carrier will be required to abide the deferral period before it receives payment, whereas plaintiff will be paid promptly. Notwithstanding the procedural pitfalls that plaintiff's solution may entail, as between a plaintiff who has purchased UM coverage, and an insurer who has sold such coverage with the expectation that it will have to pay UM claims where the tortfeasor's insurer is insolvent, clearly the burden should be imposed on the UM insurer to pay the claim as promptly as possible and abide the deferral period for reimbursement.
Regardless of plaintiff's contention that the result she advances has a benign impact on all affected interests, the merits of the issue presented by this appeal must be decided by focusing on what the Legislature would have done had it considered this issue when it was structuring the JUA liquidation.
FAIRA abolished the JUA and provided for the liquidation of its $3.3 billion debt. State Farm Mut. Auto Ins. Co. v. State, 124 N.J. 32, 42-43, 590 A.2d 191 (1991). FAIRA established the New Jersey Automobile Insurance Guaranty Fund (Auto Fund), N.J.S.A. 17:33B-5, as a vehicle to pay JUA's debts. The Auto Fund is administered by a trustee pursuant to a plan of operation approved by the Commissioner. N.J.S.A. 17:33B-3b. Under the statute, the trustee may defer the payment of claims against JUA insureds for up to a period of four years. N.J.S.A. 17:33B-3b(2). *124 As noted earlier, the present waiting period is eighteen months. See N.J.S.A. 17:33B-3b(2); N.J.A.C. 11:3-2A.
A motor vehicle is "uninsured" if the "liability insurer" for that vehicle "is unable to make payment with respect to the legal liability of its insured because the insurer has become insolvent or bankrupt, or the Commissioner of Insurance has undertaken control of the insurer for the purpose of liquidation[.]" N.J.S.A. 17:28-1.1(e)(2)(b). Plaintiff concedes in her brief that the JUA is not a bankrupt. The concession is appropriate in view of the fact that proceedings against the JUA under the Federal Bankruptcy Act have never been instituted.
However, plaintiff contends that the JUA is either an insolvent insurer, or the Commissioner has undertaken control over it for the purpose of liquidation. Legislative intent is not relevant to the latter issue: the Commissioner either has or has not assumed control under the Liquidation Act. We conclude that he has clearly not done so. Two reasons compel that conclusion. First, but for FAIRA, the "sole and exclusive method of liquidation, rehabilitating, reorganizing or conserving an insurer" is the commencement of delinquency proceedings by the Commissioner pursuant to the Liquidation Act. N.J.S.A. 17:30C-3. As the Commissioner points out in his brief, no such action has been taken against the JUA. Secondly, as a creature of the Legislature, the JUA's liquidation is being accomplished pursuant to FAIRA. As will be developed further herein, the Legislature, in passing FAIRA, specifically expressed its intent that the JUA not be liquidated under the traditional procedure found in the Liquidation Act.
Resolution of the first issue, i.e., whether the JUA is an insolvent insurer within the contemplation of N.J.S.A. 17:28-1.1(e)(2)(b), requires an inquiry into what constitutes insolvency and whether the JUA is an insurer in the context of the relevant statute, although it may not be treated as an insurer for all purposes.
*125 A brief discussion of the purpose and operation of the JUA is helpful at this juncture. As a creature of the Legislature, it was organized as an unincorporated, non-profit entity in 1983. N.J.S.A. 17:30E-1 to -24. Its purpose was to provide private, passenger automobile insurance to eligible persons who could not obtain such insurance through normal market outlets. N.J.S.A. 17:30E-2.
The Legislature anticipated from the beginning that premium revenues would not sufficiently cover the expected costs of operations. Consequently, the Legislature intended to supplement the JUA's income through certain surcharges for motor vehicle violations, flat charges, and residual market-equalization charges (RMECs) imposed on automobile-insurance policy holders. In re Commissioner of Ins., 132 N.J. 209, 213, 624 A.2d 565 (1993). The JUA had an "express obligation to operate on a break-even basis[.]" In re Market Transition Facility, 252 N.J. Super. 260, 272, 599 A.2d 906 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 376 (1992). Thus,
[t]he Commissioner had ultimate financial control because the imposition of RMECs was his responsibility. He had the obligation, ..., to set the RMECs high enough to cause JUA to operate on a no-profit, no-loss basis.
[Id. 252 N.J. Super. at 273, 599 A.2d 906.]
However, except as to that limited but "very significant exception, JUA was not the Commissioner's direct responsibility," because the Board of Directors of the JUA was primarily comprised of insurance company representatives and insurance producers. In re Commissioner of Ins., supra, 132 N.J. at 212, 624 A.2d 565.
It was painfully clear by 1988 that the JUA had not achieved its goals. By that time, over 50% of New Jersey's drivers were insured through the JUA. Obviously, not all of those drivers were high risk. State Farm, supra, 124 N.J. at 42, 590 A.2d 191. By 1990, despite the imposition of RMECs, the JUA had accumulated a deficit of over 3.3 billion dollars in unpaid claims and other losses. As noted earlier, the Legislature never contemplated that the JUA would run at a deficit, and, in essence, "told the Commissioner to see to it that JUA broke even." In re Market Transition *126 Facility, supra, 252 N.J. Super. at 273, 599 A.2d 906. Undoubtedly, the Commissioner, through the imposition of RMECs, had the ability to satisfy the legislative design, but did not do so.
The inquiry into what constitutes insolvency is straight forward, and compels the conclusion that JUA meets all legal definitions of the term. The Federal Bankruptcy Act defines "insolvent" as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property[.]" 11 U.S.C.A. § 101(32)(A). Considering the JUA's statutory structure and an operating deficit of more than $3 billion the JUA essentially meets that definition. See N.J.S.A. 17:33B-3a.
The New Jersey Business Corporation Act provides that insolvent means being "unable, by its available assets or the honest use of credit, to pay debts as they become due." N.J.S.A. 14A:14-1(f). The New Jersey Uniform Commercial Code provides that "[a] person is `insolvent' who has either ceased to pay the person's debts in the ordinary course of business or cannot pay the person's debts as they become due...." N.J.S.A. 12A:1-201(23) (amended 1994). The JUA was and is unable to pay its debts as they become due in the usual or ordinary course of business.
The New Jersey Uniform Fraudulent Conveyance Act, N.J.S.A. 25:2-23, provides in pertinent part:
a. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.
b. A debtor who is generally not paying his debts as they become due is presumed to be insolvent.
The JUA easily meets the definition of a. and b. Moreover, under b., the JUA is "presumed to be insolvent."
More importantly, the Legislature in FAIRA found that the JUA was "currently operating in a substantially impaired financial state with an operating deficit ... estimated to be in excess of $3 billion ... [The JUA] is not earning new premium income or collecting subsidies in an amount sufficient to pay its claims and expenses.... [The JUA,] if it were a licensed insurer, would *127 likely be declared financially impaired or insolvent...." N.J.S.A. 17:33B-3a.
With an operating deficit in excess of $3 billion, with an inability to pay debts as they become due, with liquidation required by legislation still ongoing after five years, and with no legal or contractual requirement to pay its debts in full, the JUA squarely fits within every one of the definitions of insolvency. The adage surely applies that if it looks like a duck, acts like a duck and quacks like a duck, it should be considered a duck.
The next issue to resolve is whether the Legislature intended JUA to be considered an "insurer" in the context of N.J.S.A. 17:28-1.1(e)(2)(b). We agree with the UM insurers and amici that the JUA is not an insurer in the traditional sense of the term. Insurance companies authorized to do business in this State must be either stock or mutual companies as defined by statute. See e.g., N.J.S.A. 17:17-2, -6, -7. The JUA, clearly, is neither. The Legislature recognized the JUA's unique status in FAIRA when it observed that "if [JUA] were a licensed insurer, [it] would likely be declared financially impaired or insolvent pursuant to the provisions of [the Liquidation Act, N.J.S.A. 17:30C-1 et seq.]." N.J.S.A. 17:33B-3a (emphasis added). We interpret that statement as nothing more than a recognition that JUA is not subject to licensing, as are stock and mutual insurance companies, and, because it is neither a stock nor a mutual insurance company, it does not meet the definition of an "insolvent insurer" under the New Jersey Guaranty Act. N.J.S.A. 17:30A-1 to -20. That is so because, as to domestic insurers, an insolvent insurer is defined in the Guaranty Act as a company that is "authorized" pursuant to N.J.S.A. 17:50-1 et seq. See N.J.S.A. 17:30A-5e. Further, the Supreme Court has interpreted the Guaranty Act as evidencing the Legislature's intent "to restrict covered insolvent insurers to domestic insurers authorized to transact the business of insurance in this State under N.J.S.A. 17:17-1 et seq. and foreign insurance companies admitted to transact any class or classes of insurance in this State under N.J.S.A. 17:32-1 et seq." Railroad Roofing & *128 Bldg. Supply Co., Inc. v. Financial Fire & Cas. Co., 85 N.J. 384, 393, 427 A.2d 66 (1981) (emphasis in original). Consequently, because the JUA was a legislative creation, and not a stock or mutual company, the Legislature deemed it advisable to design a separate plan for the JUA's liquidation.
That is not to say that the Legislature intended the JUA not to be considered an insurer in other contexts. Except for the fact that it is not a stock or mutual company, the JUA's operation fits the definition of an insurer in all respects. See N.J.S.A. 17:17-1d. Indeed, our Supreme Court recognized that the very purpose of the JUA was to provide insurance coverage for high risk drivers at rates equivalent to those charged in the voluntary market. State Farm, supra. 124 N.J. at 41, 590 A.2d 191. Furthermore, we have recognized that although an entity may not fit the statutory definition of an insurer, i.e., a stock or mutual company formed for the purposes set forth in N.J.S.A. 17:17-1, it could nonetheless be considered an insurer for the purposes of UM claims under N.J.S.A. 17:28-1.1e(2)(b). See Goodwin v. Rutgers Cas. Ins. Co., 223 N.J. Super. 195, 538 A.2d 425 (App.Div. 1988) (holding that a UM carrier wrongfully withheld UM benefits from its insured, on the ground that the self-insured owner of the tortfeasor vehicle was in a bankruptcy reorganization, because the Legislature probably intended an insolvent self-insurer to be treated the same way as a traditional insurer).
Nothing exists in the legislative history of FAIRA to indicate that the Legislature was even aware of the effect FAIRA might have on claims by injured parties against their UM insurance companies. However, what is clear from FAIRA is that the Legislature recognized that the JUA, as a practical matter, was insolvent. See N.J.S.A. 17:33B-3a. Instead of permitting liquidation by the Commissioner under the Liquidation Act, it decided instead to liquidate the JUA in the manner provided by FAIRA, i.e. by a trustee "experienced in insolvency or bankruptcy," N.J.S.A. 17:33B-3b(1), and acting pursuant to a plan approved by the Commissioner. N.J.S.A. 17:33B-3b. The Legislature's determination *129 to liquidate an insolvent insurer in one fashion rather than in another does not alter the fact that the JUA is insolvent, or the reality that it acted in all respects like any other insurer. Moreover, the fact that the Legislature has created a mechanism to satisfy claims against an insolvent insurer does not render the insurer any less insolvent for UM claim purposes. State Farm Mutual Auto Lia. Ins. Co. v. Kiser, 168 N.J. Super. 230, 234, 402 A.2d 952 (App.Div.), certif. denied, 81 N.J. 348, 407 A.2d 1221 (1979) (holding that UM insurance carrier wrongly withheld UM benefits on the ground that the insured would receive payment in due course from either the Pennsylvania or New Jersey Guaranty Associations). Thus, simply because FAIRA is the method by which the Legislature has chosen to liquidate the JUA and pay its claims, does not render the JUA solvent. The liquidation plan came after the fact of the JUA's insolvency.
Another compelling reason for our conclusion that the JUA is an insurer is that under N.J.S.A. 17:28-1.1(e)(2)(b), an insured is also permitted to present a UM claim where the tortfeasor's insurer "denies coverage" to the tortfeasor. We have no doubt that if the JUA had denied coverage to Cooper for any reason in this case, plaintiff would be permitted to assert a UM claim against her UM insurers on the ground that the JUA was the "insurer" of Cooper. Any other result would be unthinkable and indefensible. The answer to the question of whether the JUA is an "insurer" should be no different within the context of the same sentence of the statute simply because the focus is on the JUA's insolvency rather than a disclaimer of coverage.
The life of a statute is not in its words but in its meaning. Nearly a half century ago, Judge Learned Hand taught us "[t]here is no more likely way to misapprehend the meaning of language  be it in a constitution, a statute, a will or a contract  than to read the words literally, forgetting the object which the document as a whole is meant to secure." Central Hanover Bank and Trust Co. v. Commissioner of Internal Revenue, 159 F.2d 167, 169 (2d Cir.1947), cert. denied, 331 U.S. 836, 67 S.Ct. 1518, 91 L.Ed. 1848 *130 (1947). The New Jersey Supreme Court has adopted this principle. See Schierstead v. City of Brigantine, 29 N.J. 220, 230-31, 148 A.2d 591 (1959); see also AMN, Inc. of New Jersey v. South Brunswick Tp. Rent Leveling Bd., 93 N.J. 518, 524-25, 461 A.2d 1138 (1983).
In Kiser and Goodwin, supra, N.J.S.A. 17:28-1.1(e)(2) was construed liberally to further the legislative intent of affording UM policyholders the protection for which they had contracted and paid. See Fernandez v. Selected Risks Ins. Co., 82 N.J. 236, 240, 412 A.2d 755 (1980); Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277, 293, 330 A.2d 360 (1974). When enacting FAIRA, the Legislature was presumably aware of the Kiser and Goodwin decisions that liberally and broadly construed N.J.S.A. 17:28-1.1(e)(2)(b) in favor of UM policyholders. If the Legislature had intended to bar UM suits when the JUA insured the tortfeasor, the Legislature could have simply provided in FAIRA that the JUA should not be considered insolvent within the meaning of N.J.S.A. 17:28-1.1(e)(2)(b). The failure of the Legislature to do so when enacting FAIRA supports the conclusion that the Legislature did not intend the liquidation of JUA to benefit or protect UM insurance companies at the expense of their policyholders. See Massachusetts Mutual Life Ins. Co. v. Manzo, 122 N.J. 104, 116, 584 A.2d 190 (1991) ("the Legislature's failure to modify a judicial determination, while not dispositive, is some evidence of legislative support for the judicial construction."). We believe that our interpretation reaches the result probably intended by the Legislature had it "anticipated the situation at hand." Dvorkin v. Dover Tp., 29 N.J. 303, 315, 148 A.2d 793 (1959). In short, we construe the statute to further New Jersey's long established policy of providing the "broadest protection" to innocent victims of highway accidents. Motor Club of America, supra, 66 N.J. at 293, 330 A.2d 360; see also State Farm Mutual Auto Ins. Co. v. Zurich Am. Ins. Co., 62 N.J. 155, 168, 180, 299 A.2d 704 (1973); Selected Risks Ins. Co. v. Zullo, 48 N.J. 362, 372-373, 225 A.2d 570 (1966); Matits v. Nationwide Mutual Ins. Co., 33 N.J. 488, 495-496, 166 A.2d 345 (1960).

*131 II
On its cross-appeal, State Farm argues that the trial judge erred in ordering it to arbitrate the UIM claim before plaintiff's underlying action against Cooper is finalized by an offer of settlement of the policy limits or a judgment exhausting the policy limits. The issue has been rendered moot by our conclusion that plaintiff may pursue a UM claim. However, we decide the issue nevertheless because the issue can be raised in other cases. Busik v. Levine, 63 N.J. 351, 364, 307 A.2d 571 (1973). We agree with State Farm's contention and reverse that part of the judgment under review. In Longworth, supra, this court held that "UIM carriers may, if they choose, honor demands from their insureds to proceed to arbitration of the UIM claim prior to disposition of the claim against a tortfeasor." Longworth, supra, 223 N.J. Super. at 195, 538 A.2d 414 (emphasis added). In so ruling, the court was mindful of the UIM statute which provides:
[a] motor vehicle should not be considered an uninsured motor vehicle under this section unless the limits of all bodily injury liability insurance or bonds applicable at the time of the accident have been exhausted by payment of settlements or judgments.
[N.J.S.A. 17:28-1.1e.]
The Longworth court stated that the exhaustion of the tortfeasor's policy limits, triggering the availability of UIM coverage, must be viewed in terms of "payment received" by plaintiff. Longworth, supra, 223 N.J. Super. at 192, 538 A.2d 414. In that context, the court recognized that an inherent conflict existed between subrogation and consent-to-settle clauses of the UIM contract with the insured's right to manage his or her litigation, and established a procedure to reconcile the conflict. Id. at 185, 538 A.2d 414.
The procedure adopted in Longworth was recently endorsed by our Supreme Court in Rutgers Casualty Ins. Co. v. Vassas, 139 N.J. 163, 652 A.2d 162 (1995). The policy, as adopted by the Court, is set forth here in detail:
[W]hen an insured under an automobile insurance policy providing UIM benefits is involved in an accident and undertakes legal action against the tortfeasor, the insured must notify the UIM insurer of that action. If, during the pendency of the claim, the tortfeasor's insurance coverage proves insufficient to satisfy the *132 insured's damages, then the insured should again notify the UIM insurer of that fact. (emphasis in the original.)
If the insured receives a settlement offer or arbitration award that does not completely satisfy the claim, because the tortfeasor is underinsured, the UIM insurer then has two options: offer to pay the insured the amount of the tortfeasor's settlement offer or the arbitration award, usually the tortfeasor's policy limit, in exchange for subrogation of the insured's rights against the tortfeasor; or, allow the insured to settle. In either case, the UIM insurer must further allow the insured the benefit of the UIM coverage. If the insured does not respond within the time allotted for rejection of the award or settlement offer, the insured victim may, consistent with Longworth, supra, move for a declaratory ruling on order to show cause concerning the parties' rights and responsibilities. In this manner, the insured victim is afforded the protection and benefits of the tortfeasor's insurance coverage in addition to the insured's own UIM coverage. As well, the UIM carrier is able to weigh the relative merits of allowing its insured to settle and paying the difference in UIM benefits compared with paying its insured the settlement offer plus UIM benefits and itself maintaining a subrogation action against the tortfeasor.
The Longworth procedure balances the interests of insureds and insurers, injured victims and tortfeasors. It provides the insured victim an opportunity both to assert liability against the tortfeasor and to determine the liability of the UIM insurer. In addition, it apprises the UIM insurer of pending litigation by one of its insureds, which may obligate it to provide UIM coverage under the insured's policy.
[Id. at 174-175, 652 A.2d 162.]
Clearly, none of the conditions warranting the involvement of the UIM insurer in this case has occurred. Thus, it is inappropriate to compel State Farm to participate in what may very well be meaningless arbitration.
In conclusion, the judgment under review is reversed on plaintiff's appeal and on State Farm's cross-appeal.
NOTES
[1] Plaintiff sought UIM arbitration as alternative relief in the event she did not succeed in obtaining UM arbitration.
[2] The trial on the damage issue has been stayed pending disposition of this appeal.
[3] State Farm and Prudential are referred to herein collectively as the UM or UIM carriers.
[4] A "covered claim" under the New Jersey Property Liability Insurance Guaranty Association Act, N.J.S.A. 17:30A-1 to -20, does not include any amount due an insurer as a subrogation recovery. See Sussman v. Ostroff, 232 N.J. Super. 306, 556 A.2d 1301 (App.Div.), certif. denied, 117 N.J. 143, 564 A.2d 865 (1989) (Workers Compensation claim).