93 N.J. Super. 501 (1967)
226 A.2d 448
PIETER VELKERS, JR. AND PIETER VELKERS, SR., PLAINTIFFS,
v.
GLENS FALLS INSURANCE COMPANY, GENERAL ACCIDENT & LIFE ASSURANCE CORPORATION, LTD., INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, FOREIGN CORPORATIONS, LYNN CHEVROLET, INC., A CORPORATION, PETER A. FRAZZA, EDWARD COLEMAN AND JUDITH COLEMAN, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 24, 1967.
*505 Mr. Nicholas Scalera, attorney for plaintiffs.
Mr. Gordon L. Kent for defendant Glens Falls Insurance Company (Messrs. Budd, Larner, Kent & Gross, attorneys; Mr. Mark D. Larner, on the brief).
Mr. John J. Gaffey for defendants General Accident & Life Assurance Corporation, Ltd. and Lynn Chevrolet (Messrs. Gaffey, Webb & McDermott, attorneys).
Mr. Robert J. McCoid for defendant Indemnity Insurance Company of North America (Messrs. Schneider & Morgan, attorneys).
Mr. Avrom J. Gold, attorney for defendant Peter A. Frazza.
Mr. Thomas F. Campion for defendant Edward Coleman and Judith Coleman (Messrs. Shanley & Fisher, attorneys).
MINTZ, J.S.C.
Plaintiffs seek a declaratory judgment to determine the existence and extent of insurance coverage under three insurance liability policies.
On August 5, 1963 an accident occurred on Bloomfield Avenue, Nutley, N.J., when a vehicle driven by Edward Coleman collided with a 1953 Dodge automobile driven by Pieter Velkers, Jr. As a result, personal injury suits were instituted and are presently pending in the Superior Court *506 by the Colemans and Peter Frazza, the latter being a passenger in the Coleman vehicle. Pieter Velkers, Jr. (hereinafter referred to as Junior), his father Pieter Velkers, Sr. (hereinafter referred to as senior) and Lynn Chevrolet (hereinafter referred to as Lynn) are defendants in these actions.
The present controversy essentially is to determine, for the purposes of insurance coverage, who owned the 1953 Dodge which was being driven by Junior at the time of the accident. The testimony reveals a complex factual pattern. The Dodge was purchased by Senior from Joseph Bator in June 1963. Though the certificate of ownership indicated only "Pieter Velkers" as owner without distinguishing between Senior or Junior, it is apparent that Senior was the intended "legal" owner of the vehicle. Upon Junior's obtaining a driver's license and insurance coverage, he was to have the exclusive use of the Dodge and was responsible for its maintenance. The Velkers, through James D. Williams, an insurance agent, sought to obtain insurance for the Dodge. Thus, an application for coverage was made in June of 1963 to Indemnity Insurance Company of North America (hereinafter referred to as INA). Senior, as the owner of a 1960 Oldsmobile, was already the named insured under a "Family Automobile Policy" issued by INA, affording coverage up to $500,000. Accordingly, Williams requested that the Dodge be added as an insured vehicle under this policy. INA refused to make such an addendum to the family policy apparently because it was aware that Junior was to be the principal driver and it did not want to insure a teenage driver for such high limits. However, INA informed Williams that it would temporarily insure Junior as on a $10/20,000 policy until he could place Junior in the Assigned Risk Plan.
After obtaining a driver's license in June 1963 Junior applied for insurance as an assigned risk. The application was filled out by Williams upon information supplied bona fide by Junior. It indicated that Junior was the registered owner of the Dodge. Consequently, the Glens Falls Insurance Company (hereinafter referred to as Glens Falls) issued a *507 policy in July of 1963 insuring the Dodge and designating Junior as the named insured.
After the issuance of the Glens Falls policy, Senior decided to transfer the registration of the Dodge to Junior's name. To this end, Senior endorsed his name on the back of the certificate of ownership. However, an effective transfer was not consummated since Senior never delivered the certificate of ownership to Junior for the latter's signature and thus a new certificate of ownership and registration was not obtained in Junior's name. Senior explained at trial that he did not deliver the document to Junior because at about that time Junior had seen a 1958 Chevrolet at Lynn which he wanted to purchase and he (Senior) concluded that it was pointless to go through with the transfer.
On August 1, 1963 Junior and his parents went to Lynn in order to effect a deal for the Chevrolet. An agreement was reached between Ovell E. Robertson, a Lynn salesman, and Senior whereby the Chevrolet was to be purchased for $995, less a $95 trade-in allowance for the Dodge. Senior paid $100 on August 1 and agreed to pay the balance of $800 upon delivery of the Chevrolet on August 2.
On August 1 or 2 Senior also tendered the certificate of ownership for the Dodge to Robertson. Robertson did not accept it stating that it was "no good" since Senior had already endorsed it over to Junior. Robertson said "that it had to be transferred in the Motor Vehicle Department" and told Senior that same could be done the following week. Though there is conflicting testimony as to precisely when the bill of sale for the Dodge was delivered to and accepted by Lynn, it is clear that it was not accomplished until some time after the accident.
On Friday, August 2, 1963, Junior and Senior went to Lynn separately in order to consummate the transaction by paying the balance of the purchase price for the Chevrolet. Senior gave Robertson a check for $800, the balance of the purchase price, and obtained a receipt for same and an invoice for the Chevrolet which was marked "paid in full." Senior *508 also received a guarantee certificate on the Chevrolet and the registration card indicating title in "Pieter Velkers." The license plates originally on the Dodge were transferred of record to the Chevrolet. The evidence is in conflict as to the date when the Dodge was delivered to Lynn, but clearly this was done on or before August 3.
Before leaving the Lynn premises on August 2 it was discovered that the Chevrolet had some transmission trouble and the Velkerses refused to take the car off the lot until the trouble was remedied. Robertson told the Velkerses to return the next morning (August 3) when the Chevrolet would be completely repaired.
The events on Saturday, August 3, 1963 are unclear. Junior testified that when he returned to Lynn he was informed that the Chevrolet had not yet been repaired. Junior importuned Robertson for the Chevrolet since he had arranged a trip to the New Jersey shore for the weekend. He could not use the Dodge because the registration had been delivered to Lynn and the license plates had been transferred to the Chevrolet as a matter of record. According to Junior, Robertson agreed that Junior could use the Chevrolet over the weekend even though it was not working properly. Junior was to return the Chevrolet Sunday evening, transfer the plates to the Dodge, and drive home in the Dodge which Robertson agreed to leave in the Lynn driveway. Robertson denied making such arrangements and testified that he was not at work at Lynn Chevrolet on Saturday, August 3, since he habitually went to his home at the seashore on summer weekends.
Junior testified that he dropped the Chevrolet off at Lynn on Sunday evening, August 4, and picked up the Dodge as per arrangement. He emphasized that he used the Dodge only to get home and did not intend to retake ownership.
According to Junior, the following afternoon, August 5, he drove the Dodge to Lynn in order to return it. Since the Chevrolet was still not ready, Junior decided to drive home in the Dodge. It was on the way home that the accident occurred.
*509 The Chevrolet was finally ready on Tuesday, August 6. Junior drove to Lynn that afternoon in the Dodge. While he was there, Robertson noticed a dent in the Dodge. When questioned as to the cause thereof, Junior deliberately and admittedly lied by telling Robertson that the dent was always there.
Lynn, believing Junior's representation that the dent had always been there, made no attempt to notify its insurance carrier regarding the occurrence of an accident. The first time that Lynn became aware that an accident had occurred was by a letter dated July 12, 1965 signed by Allan Maitlin, a Newark attorney. Mr. Maitlin advised Lynn that he had been retained by the Velkerses with respect to the accident. He stated that it was his opinion that Lynn was the owner of the Dodge at the time of the accident and thus the Velkerses would be additional insureds under Lynn's liability policy. Lynn forwarded this correspondence to its insurance carrier, General Accident, Fire and Life Insurance Corporation, Ltd. (hereinafter referred to as General Accident). On September 20, 1965 General Accident informed Mr. Maitlin by letter that it was the company's decision that the comprehensive general liability policy issued to Lynn did not apply to either of the Velkerses. The disclaimer letter indicated that the Velkerses were not considered additional insureds, and furthermore, that no notice of the accident was received by General Accident until almost two years after its occurrence, thereby violating a condition of the policy which required notice as soon as practicable.
The Velkerses bring this declaratory judgment action seeking coverage by Glens Falls, INA and General Accident, either collectively or individually.
A partial summary judgment was entered on July 29, 1966 against Glens Falls obligating that company to provide insurance coverage to Junior under its policy. Glens Falls had undertaken the investigation and defense of the lawsuit arising from the accident for a prolonged period of time. Its disclaimer letter of June 25, 1965 and attempted withdrawal *510 from the Velkers defense on the grounds that Junior had misrepresented himself to be owner of the Dodge on the insurance application and that he did not own the vehicle on the date of the accident simply came too late. The effect of the partial summary judgment is to preclude Glens Falls from utilizing the alleged misrepresentation on the application for insurance or any breach of policy conditions or terms as a basis for a disclaimer of liability. However, the policy is in every other respect applicable in order to determine the nature and extent of the coverage afforded. Such a determination may be made only by deciding the applicability of the INA and General Accident policies. This is necessary because of the "other insurance" clause in the Glens Falls policy which renders the type of coverage either pro rata or excess, depending on who owns the vehicle involved in the accident. Similarly, the nature and extent of the coverage afforded by INA and General Accident may be determined only after deciding who owned the Dodge at the time of the accident because of the "other insurance" clauses in their respective policies.
Regardless of the decision as to ownership of the Dodge, General Accident is relieved of any liability and duty to defend the Velkerses. Such determination results from the prolonged delay in the giving of notice to General Accident. The General Accident liability policy provides that:
"In the event of an an accident or occurrence, written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable." (Emphasis added)
The policy defines "insured" as any person using an owned or hired vehicle with the permission of the named insured. Assuming Junior's contentions to be true that the Dodge was owned by Lynn and that he was driving it with their permission at the time of the accident, under the afore-mentioned notice provision the company was entitled to notice of the accident as soon as practicable as a condition precedent to coverage. Whittle v. Associated Indemnity Corp., 130 N.J.L. 576 (E. & A. 1943). An additional insured (one other than *511 the named insured) under a policy of insurance is required to comply with the conditions of the policy in the same manner as the named insured. Costanzo v. Pennsylvania Threshermen & Farmers' Mutual Casualty Ins. Co., 30 N.J. 262, 271-272 (1959); Whittle v. Associated Indemnity Corp., supra; Bankers Indemnity Ins. Co. v. A.E.A. Co., Inc., 32 N.J. Super. 471 (App. Div. 1954).
Did Junior give notice to either Lynn or General Accident "as soon as practicable"? The phrase "as soon as practicable" within the notice provision of a liability policy has been uniformally construed to mean "within a reasonable time." Figueroa v. Puter, 84 N.J. Super. 349 (App. Div. 1964); Associated Metals, etc., Corp. v. Dixon Chemical, etc., 82 N.J. Super. 281, 316 (App. Div. 1964); Bass v. Allstate Ins. Co., 77 N.J. Super. 491, 495 (App. Div. 1962). What is a reasonable time depends on the facts and circumstances of the particular case. Ebert v. Balter, 74 N.J. Super. 466 (App. Div. 1962), on remand 83 N.J. Super. 545 (Law Div. 1964). In determining reasonable time under given conditions, it has been held that the permittee of a named insured under a garage liability policy was not obligated to notify the insurer under the notice provision of the policy until the permittee became aware that he came within the extended coverage of the policy. Mariani v. Bender, 85 N.J. Super. 490 (App. Div. 1964); see also Bass v. Allstate Ins. Co., supra. However, ignorance of the existence of an insurance policy which may cover a liability situation is only one circumstance to be considered in determining whether or not due diligence was exercised in giving notice. To operate as an effective excuse, lack of knowledge as to insurance coverage should be without negligence or fault of the person seeking to be excused. See 8 Appleman, Insurance Law and Practice, § 4745. The additional insured is at least under an obligation not to act so as to prevent the insurer from receiving notice of the accident as soon as practicable.
In deciding that General Accident did not receive notice as soon as practicable, reference is made to the decision *512 in Unverzagt v. Prestera (Indemnity Ins. Co. of North America, Garnishee), 339 Pa. 141, 13 A.2d 46 (Sup. Ct. 1940). Therein Prestera, while driving a borrowed car with the permission of the owner (Campbell), was involved in an accident in which plaintiff suffered injuries. A few days later Prestera returned the car to its owner, but made no mention of the accident. Approximately four months later the owner of the car learned of the accident when he was served with suit papers by plaintiff. Campbell then reported the accident to his insurance company, which had issued him a liability policy wherein it was provided that the word "insured" included not only the named insured, but also any person while using the automobile with his permission. Prior to this time Prestera had no knowledge of the policy which required, as a condition precedent, the giving of written notice to the company by or on behalf of the insured "as soon as practicable." In deciding that Prestera did not exercise due diligence and thus relieved the insurance company of any liability under its policy, the court stated:
"There is not a single fact, moreover, to indicate the exercise of due diligence on Prestera's part. * * * Contracts of insurance like the present one are not uncommon, and the only person who would have such a policy would be the owner of the car. Under such circumstances, Prestera not only did not inquire concerning the possible insurance, but he did not even report the accident to the owner, so that the latter might have an opportunity to inform him concerning any insurance. And this even in view of the fact that he spoke face to face with Campbell, and the mails and other forms of communication were at all times open to him. Prestera simply did not choose to report the accident to the owner of the car. Clearly he did not exercise due diligence under the circumstances and it is a verdict against him that the insurance company is now asked to pay. The garnishee (the insurance company), therefore, should not be visited with the burden of indemnifying him, since he failed to comply with the condition of the contract." (at p. 48; citations omitted)
The facts in the case here under consideration are similar to those in Unverzagt and present even more compelling reasons for precluding any liability of General Accident. Junior not only did not inform Lynn (whom he asserts to *513 be the owner of the Dodge) of the occurrence of a serious accident when he returned the car, but deliberately lied when questioned as to the cause of the dent in order to conceal the true facts. Though at that time Junior could not reasonably have been expected to realize that he may have been an additional insured under Lynn's policy, his flagrant conduct prevented Lynn, who was then the only reasonable source of notice, from acting in accordance with the terms of its policy. Senior, who was also aware of the accident shortly following its occurrence, likewise failed to notify Lynn.
The instant situation is unlike that in Mariani v. Bender, supra. There, though the permittee of the vehicle lied to the owner in order to conceal the occurrence of an accident while driving a borrowed vehicle, the insurance company received notice of the accident anyway approximately 1 1/2 months after it occurred. In this case we have a situation where the insurance company did not receive notice until approximately two years after the accident. The court in Mariani determined that the time interval of 1 1/2 months between the date of the accident and the giving of notice to the insurance carrier was not unreasonable. The approximate two-year interval in the instant case, however, is clearly unreasonable in the light of all of the facts and circumstances.
It is settled law that an insurance company will be relieved of liability where the insured has failed to fulfill the condition precedent of the policy of giving timely written notice of an accident covered by the policy. This result obtains regardless of whether or not the company has been prejudiced by such failure. Whittle v. Associated Indemnity Corp., supra; Figueroa v. Puter, supra; cf. Vassilakis v. Glens Falls Ins. Co. (App. Div. 1966). However, absence of prejudice to the company may be considered as a factor in determining whether or not the notice was given within a reasonable time. Bass v. Allstate Ins. Co., supra. Clearly the two-year delay in giving notice to General Accident was prejudicial. The purpose of the notice condition in an insurance policy is to give the insurer an opportunity to make *514 a timely and adequate investigation of all the facts and circumstances surrounding the accident. An adequate investigation cannot be made where notice is so long delayed because of the possible removal or lapse of memory on the part of witnesses, and the loss of opportunity for examination of the physical surroundings for use at trial. See 8 Appleman, Insurance Law and Practice, § 4731. Furthermore, if the insurer is thus given the opportunity for a timely investigation, reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation. Ebert v. Balter, supra. These purposes certainly were not served by the Velkerses' conduct resulting in the long delay.
Consequently, regardless of any theory advanced by plaintiffs in attempting to apply the substantive terms of the General Accident policy, that defendant will be relieved of liability to the Velkerses because of their failure to give notice as soon as practicable.
Relieving General Accident from any liability under its policy does not obviate a determination as to ownership of the Dodge at the time of the accident. This determination is compelled because of the "other insurance" clauses in the Glens Falls and INA policies.
In deciding the ownership of the Dodge at the time of the accident, this court is controlled by the decision in Eggerding v. Bicknell, 20 N.J. 106 (1955). The court there held that for the purposes of insurance coverage, legal title to an automobile could not be considered transferred until the parties have strictly complied with the rules promulgated by the Director of the Division of Motor Vehicles pursuant to R.S. 39:10-4, R.S. 39: 10-22 respecting transfer of title to automobiles. The court reached this determination notwithstanding that the full purchase price had been paid for the vehicle by the buyer. The court stated:
"* * * [W]e are satisfied that the ownership of the Chrysler had not passed from Shonka Motors to Bicknell * * * at the time of the accident on October 29, 1953. Our Legislature has prescribed a specific method for transferring title to motor vehicles * * *.
*515 In the instant matter no proper assignment within the contemplation of the statute was executed by the seller prior to the accident of October 29, 1953. The Director of the Division of Motor Vehicles has been duly authorized to promulgate rules and regulations and prescribe necessary forms. R.S. 39:10-4; R.S. 39: 10-22. He did prescribe an assignment form which, for obviously sound reasons, directed that the seller's signature be withheld until the assignment form was completed by the insertion of the date and the name of the buyer. This direction was ignored by the seller Chonka Motors which signed the assignment in blank; under the statute the incomplete assignment did not legally serve to transfer title from Chonka Motors to Bicknell or his wife." (at pp. 111, 112; citations omitted.)
Similarly in the instant case, when the Dodge was delivered to Lynn the certificate of ownership was not properly assigned and, in fact, was rejected. N.J.S.A. 39:10-9 prescribes the method for transferring title to used automobiles and provides that:
"When a used motor vehicle is sold in this State, the seller shall, except as provided in section 39:10-15 of this Title, execute and deliver to the purchaser, an assignment of the certificate of ownership or an assignment of the bill of sale issued prior to October 1, 1946."
The testimony of Robertson may be recalled to the effect that when the certificate of ownership was tendered it was not in proper form, and consequently he told the Velkerses to make the appropriate corrections and return with it the following week. In the interim, the accident occurred. Under Eggerding this court is constrained to find that for the purpose of determining insurance coverage the Dodge was still owned by Senior at the time of the accident.
It has been asserted by plaintiffs and INA that Eggerding stands for the proposition that the parties' intent is elemental in determining whether title has been effectively transferred. It is argued that where the parties intended a completed transaction and had no intention of evading the statute, there may be an effective transfer of ownership notwithstanding a failure to comply with the statutory requirements. Plaintiffs and INA stress that the court in Eggerding was concerned with intention because in the course of its opinion it stated:
*516 "Furthermore, the very omissions of the name of the buyer and the date of the transaction, coupled with the retention of dealer's plates on the car, indicate that the parties themselves did not at that time envision a completed transaction transferring title from the seller to the buyer. Under the circumstances, the fact that the purchase price was fully paid does not negate the intention that there would be further steps taken before Chonka Motors would be divested of its ownership and that in the meantime any applicable responsibility and insurance coverage of Chonka Motors, as legal owner, would continue in normal effect" (at p. 112; emphasis added)
In further support of this contention, reliance is placed upon Ethridge v. Allied Equipment & Supply Co., 26 N.J. Super. 586 (App. Div. 1953) and Red Bank Hudson, Inc. v. Pawtucket Mutual Ins. Co., 36 N.J. Super. 556 (Law Div. 1955).
Eggerding is authority for the proposition that in order to effectively transfer title to a motor vehicle for insurance purposes, there must be strict compliance with the statutory directions. Whether or not an insured is the "owner" of a motor vehicle depends upon whether the statutory prerequisites relating to the transfer of title have been satisfied.
In Ethridge v. Allied Equipment & Supply Co., supra, defendant buyer was attempting to avoid the sale of a motor vehicle after partial payment and delivery, on the grounds that the statutory requisites for the transfer of motor vehicles was not complied with. The court held that defendant could not avoid the transaction merely because the proper papers were not delivered when he took possession since it was clear that the parties envisioned a completed transaction upon physical transfer of the vehicle. This decision is distinguishable from the facts in Eggerding and the instant case. The court in Ethridge was basically concerned with a suit for the balance due on the purchase price of a vehicle. Defendant therein was not denying that a sale was contemplated between the parties, but was trying to avoid same for the reasons asserted above. It was in light of those assertions that the court determined that as between the parties the sale was completed and that the seller should assign the certificate of ownership upon full payment of the purchase price. The court was not *517 concerned with determining ownership at a specific time, but decided only that the seller was entitled to the balance of the purchase price upon delivery of the certificate of ownership. See also Gaub v. Mosher, 3 N.J. Misc. 605, 129 A. 253 (Ch. 1925).
In Red Bank Hudson v. Pawtucket Mutual Ins. Co., supra, in determining ownership of a vehicle for the purposes of deciding who was entitled to the benefits of a collision insurance policy, the court exclusively relied on Ethridge for the proposition that if there is no intention to evade the statute, then title will be considered transferred when possession is transferred. However, Ethridge was not meant to apply to the circumstances in Eggerding, nor in the present case. The court in Ethridge specifically excused the tendering of the assignment of the certificate of ownership by the seller before suit because defendant sought to avoid the otherwise completed transaction. In Eggerding, as in the instant case, the court was and is not being asked to compel the parties to do that which they contracted to do, i.e. respectively to pay the balance of a purchase price and properly assign a certificate of ownership. Rather, the court is being asked to decide who owned a motor vehicle at the time of an accident so that proper insurance coverage may be determined. Moreover, it is significant that the court in Eggerding did not allude to the earlier pronouncements in Ethridge and in Red Bank, supra. Seemingly, it was not primarily concerned with "intention" as an element of effective transfer of title to a motor vehicle where the statutory requisites were not followed. Rather, it predicated its decision upon the proposition that the incomplete assignment under the statute did not legally serve to transfer title, and merely made the further or added observation that in any event the parties themselves did not, at the time in question, envision a completed transaction transferring title from the seller to the buyer.
So here, the tendered assignment form did not legally serve to transfer title from Senior to Lynn and in fact was *518 rejected. Additionally, it may be urged that while there was testimony to the effect that the parties regarded the transaction as complete upon the delivery of the Dodge to Lynn and the payment of the balance of the purchase price on the Chevrolet, the fact remains that at the time of the accident the Chevrolet was yet to be repaired and delivered to the Velkerses. Perhaps the transaction was not fully consummated until the Chevrolet was delivered in proper working order. It will also be remembered that Junior told the police immediately after the accident that he was the owner of the Dodge. Thus, the fact that the purchase price was fully paid may not negate the intention that the Chevrolet was to be repaired and delivered to Junior before Senior was divested of ownership in the Dodge, and that in the interim the insurance coverage afforded to both Senior and Junior would continue in normal effect. In any event, as already observed, regardless of intention, the statutory requisites for an effective transfer of title to the Dodge from Senior to Lynn were not complied with on the date of the accident.
The court is not unmindful of the decisions from other jurisdictions which invoke the principle of equitable ownership regardless of whether or not the respective statutes which establish the method of transferring titles to motor vehicles are complied with. See Olin Mathieson Chem. Corp. v. Southwest Cas. Co., 149 F. Supp. 600 (D.C.W.D. Ark. 1957); American Motorists Ins. Co. v. Trinity Universal Ins. Co., 240 F.2d 67 (5 Cir. 1957); Hartman v. Norman, 253 Iowa 694, 112 N.W.2d 374 (Sup. Ct. 1962); Burt v. Cordover, 117 A.2d 116 (D.C. Mun. Ct. App. 1955); Truck Ins. Exchange v. Schuenemann, 391 S.W.2d 130 (Tex. Civ. App. (1965)). For as already noted, this court is controlled by the principle set forth in Eggerding.
It now must be determined whether the "Family Automobile Policy" issued by INA to Senior covers the Dodge. That policy covers Senior as the named insured and a 1960 Oldsmobile as the insured vehicle. It must be remembered that INA specifically refused to add the Dodge as a covered *519 automobile when so requested by Williams. It did agree to provide $10/20,000 on a temporary basis until Senior could obtain other insurance protection. However, INA's policy provides:

"CONDITION 2. Premium
If the named insured * * * acquires ownership of or replaces a private passenger, * * * automobile * * *, he shall inform the company during the policy period of such change. Any premium adjustment necessary shall be made as of the date of such change * * *."
The policy undertakes to insure persons driving an owned automobile with the permission of the named assured. It defines an owned vehicle as "a private passenger, farm or utility automobile or trailer owned by the named insured * * *." The issue arising from INA's expressed desire not to insure the Dodge, and from the quoted policy provisions, is whether or not those provisions operate so as to impose "automatic insurance" coverage upon vehicles, other than the named vehicle, acquired by the named insured. And if the quoted provisions do so operate, does the insurance company's express refusal to insure the additional vehicle make those provisions inoperative?
A provision identical to "Condition 2" in the INA policy has been interpreted to provide automatic coverage for newly acquired vehicles. Nat'l Union Fire Ins. Co. v. Falciani, 87 N.J. Super. 157 (App. Div. 1965). Consequently, coverage was afforded for the Dodge automatically upon the acquisition of the vehicle. See 7 Appleman, Insurance Law and Practice, § 4293. Moreover, INA's refusal to recognize its policy as covering the Dodge was of no effect. For the premium paid, INA agreed to insure any vehicle newly acquired by the named insured. It was implicit in "Condition 2" that as a condition subsequent the named insured would pay any premium adjustment for coverage on the later acquired vehicle. If INA chose not to accept this risk, it could cancel the policy and return the unearned premium to the *520 insured pursuant to the cancellation clause in the policy. It did not do so. Thus INA was under a contractual obligation to cover the Dodge and its refusal to do so was nugatory. That Senior purchased the Dodge primarily for the use of his son does not mitigate INA's obligations under its policy. Nat'l Union Fire Ins. Co. v. Falciani, supra, at p. 170.
We are now at a point where it has been determined that Senior owned the Dodge at the time of the accident and that Senior's "Family Automobile Policy" issued by INA affords coverage for that vehicle as an owned vehicle. The only issue left to decide with respect to insurance coverage is the applicability of the "other insurance" provisions in the respective policies of insurance issued by Glens Falls and INA. The INA policy provides that:
"If the insured has other insurance against a loss covered by Part I of this policy, the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; * * *."
The Glens Falls "other insurance" provision (Condition 20 in said policy) similarly provides for pro rata coverage, except where the insured is driving a non-owned or "other" automobile, in which event "excess" coverage is afforded. Insuring Agreement V of the Glens Falls policy concerns itself with coverage when the named insured is driving an "other" automobile and states:
"V. Use of Other Automobiles. If the named insured is an individual * * * and if during the policy period such named insured, * * * owns a private passenger automobile covered by this policy, such insurance as is afforded by this policy * * * with respect to said automobile applies with respect to any other automobile, * * *." (Emphasis added)
In applying the above provision in connection with Condition 20, the "other insurance" provision, it appears that in order for the named insured to be covered while driving an "other" *521 vehicle he must, at that time, own a vehicle specifically covered by the policy. It follows that the Dodge could not be considered an "other" or non-owned vehicle since it was the one specifically insured by Glens Falls. In order to have an "other" vehicle, there first must be an owned vehicle. The Dodge could not, at the same time, be considered the "owned" vehicle and the "other" vehicle. Therefore, in order to give effect to the "other insurance" provision, the Dodge must be considered as the owned vehicle under Insuring Agreement V. Glens Falls specifically undertook to insure the Dodge as the vehicle and Junior as the named insured. Glens Falls may not now assert that under its "other insurance" provision the Dodge was a non-owned or "other" vehicle for which only excess coverage was afforded. Cf. Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 123, 124 (1962). It necessarily follows that INA and Glens Falls under their respective policies of insurance afford pro rata coverage to the Velkerses.
The court recognizes the anomaly in finding that as between Senior and Lynn, Senior is the owner of the vehicle which is covered as an owned vehicle under the INA policy; and that for the purposes of applying the Glens Falls "other insurance" provision, Junior is to be considered the owner. Such a peculiar result follows from Glens Falls' having undertaken to defend the Velkerses in the primary negligence action and the consequent partial summary judgment that Glens Falls must afford coverage to Junior; and also from the necessity of a determination as to the legal ownership of the Dodge for purposes of insurance coverage as between Senior and Lynn.
An appropriate form of judgment will be entered, consented to as to form or to be settled on notice.