662 A.2d 967

ROBERT VERRIEST, PLAINTIFF–APPELLANT, v. INA UNDER-WRITERS INSURANCE COMPANY, DEFENDANT–RESPON-DENT, AND JAMES CURLEY PIERCE AND THROCKMORTON TEXACO CORP., DEFENDANTS.

MARY C. PRICE, GENERAL ADMINISTRATRIX, ADMINISTRA-TRIX AD PROSEQUENDUM OF THE ESTATE OF SHERRY ANN PRICE, DECEASED, AND INDIVIDUALLY, AND JOHN A. PRICE, PLAINTIFFS–APPELLANTS, v. INA UNDERWRITERS INSURANCE COMPANY, DEFENDANT–RESPONDENT, AND JAMES CURLEY PIERCE, THROCKMORTON TEXACO CORP., THROCKMORTON'S (THROCKMORTON) TEXACO, INC., AND JAMES H. PIERCE, DEFENDANTS.

Argued May 1, 1995—Decided August 23, 1995.

402

*Patricia J. Cooney* argued the cause for appellant Robert Verriest (*O'Connor & Rathican,* attorneys; *Gerald B. O'Connor,* of counsel and on the joint brief).

*Barbara L. Birdsall* argued the cause for appellants Mary C. Price, etc., et al. (*Stout & O'Hagan,* attorneys; *William S. O'Hagan, Jr.,* of counsel).

*Robert Gregory Leonard* argued the cause for respondent (*Leonard & Butler,* attorneys; *John R. Scott,* on the letter brief).

PER CURIAM.

On November 18, 1984, James Curley Pierce (Curley) was involved in an automobile accident that killed one person and seriously injured another. This appeal addresses whether a business-automobile policy issued by INA Underwriters Insurance Company (INA) covers Curley for liability arising out of that accident. The Law Division found that the policy afforded coverage. In an unreported opinion, the Appellate Division reversed. We granted certification. 139 *N.J.* 288, 654 *A.*2d 469 (1994).

I

The facts in this matter are essentially undisputed. Approximately two-and-one-half weeks prior to the accident, Charles Janulewicz brought his 1974 Cadillac to Throckmorton Texaco

Corp. (Throckmorton), a sole proprietorship owned by James H. Pierce (James H.), in search of an interested buyer. Although Throckmorton was in the business of "detailing," which consists of washing, polishing, and waxing cars, Janulewicz assumed that James H. was an automobile dealer because he frequently had seen cars "sitting around the lot with no plates." Curley, James H.'s cousin who had moved to New Jersey approximately three weeks earlier and was working at Throckmorton, expressed interest in the car but lacked the money to buy it. James H., however, purchased the car for Curley, apparently for $150, and Curley was to repay James H. After receiving the money, Janulewicz removed the license plates from the car, signed and dated the Certificate of Ownership, leaving the name of the buyer blank, and gave the certificate and keys to James H. James H. immediately turned over the Certificate of Ownership and keys to Curley. The car, however, remained on the Throckmorton lot because, according to James H., Curley lacked the money "to pay [him] for the car" and "to get the car registered." During the two-and-one-half weeks that the Cadillac remained on the Throckmorton lot prior to the accident, Curley performed repair work on the vehicle, which James H. observed.

Shortly after purchasing the car, James H. contacted his insurance agent and arranged a meeting at which Curley was to have insured the car. That meeting was to have taken place the day after the accident. Apparently, Curley also was to have registered the car on that day.

Four days prior to the accident, James H. drove to Florida to attend a funeral, leaving Curley in charge of the business. In fact, Curley lived in a utility room in the Throckmorton premises during James H.'s absence. The day before the accident, while James H. was still away, Curley went into a locked drawer in James H.'s office, removed two automobile-dealer plates registered to D'Amico Lincoln Mercury (D'Amico), and put them on the Cadillac. Both James H. and Curley agreed that Curley had received no authorization to use those plates. Curley then took

the Cadillac and went out drinking with a couple of friends "all night." Early the next morning, while Curley was driving the Cadillac, he crossed the center line of a roadway and collided head on with a vehicle driven by Sherry Ann Price. Price died as a result of the injuries she had sustained in the accident. Robert Verriest, a passenger in Price's vehicle, sustained severe injuries.

At the time of the accident, Throckmorton and James H. were insured under a business-automobile policy issued by INA, which had a $300,000 per occurrence liability limit. (Although the policy listed Throckmorton as the named insured, James H. was also a named insured under the policy because Throckmorton was a sole proprietorship, not a corporation.)

Verriest and Price's parents brought suit against Curley, Throckmorton, James H., and D'Amico, alleging negligence. INA provided a defense for James H. and Throckmorton, but did not defend Curley. Curley failed to answer the complaints, and the trial court entered a default judgment against him. D'Amico appeared in the action through separate counsel and was eventually awarded summary judgment. A jury trial resulted in a verdict in favor of defendants. In answers to specific interrogatories, the jury found that Curley had not been acting in the scope of his employment at Throckmorton at the time of the accident and that neither James H. nor Throckmorton had been negligent in employing Curley. During that trial, however, plaintiffs proved their damages against Curley, and the jury returned a verdict against Curley for $422,500 in the *Verriest* suit and $75,000 in the *Price* suit. Because Curley was judgment proof, he assigned his rights against INA to plaintiffs.

Plaintiffs then brought this suit against INA to determine coverage. The Law Division initially granted INA's motion for summary judgment, reasoning that plaintiffs' claims were barred by the entire-controversy doctrine. In an unreported opinion, the Appellate Division reversed and remanded, finding "nothing in *R.* 4:27–1B [predecessor to *Rule* 4:30A] [that] requires a personal

injury claimant to join or combine a coverage suit with a common-law negligence case."

The parties then cross-moved for summary judgment on the issue of coverage under the INA policy. Under that policy, INA agreed to pay "all sums *the insured* legally must pay as damages because of bodily injury ... to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or *use* of a *covered auto.*" (Emphases added). The policy defined a covered auto as "ANY AUTO," and defined an insured as either the named insured (Throckmorton or James H.) or "[a]nyone else ... using with your [the named insured's] permission a covered auto you [the named insured] own, hire or borrow."

The Law Division granted summary judgment in favor of plaintiffs, finding that Curley was entitled to coverage under the policy because the Cadillac had been a covered auto and Curley's use of that vehicle had been permissive. In an unreported opinion, the Appellate Division reversed, noting that the trial court had improperly failed to focus on the question of ownership. Examining the policy, the Appellate Division reasoned that "[b]ecause Curley was not a named insured he was not an 'insured' entitled to coverage unless he was using a covered auto owned, hired or borrowed by the named insured with the named insured's 'permission.'"

The court initially found that James H. had not been the "true" owner of the Cadillac, essentially because James H. had bought the car for Curley and "[t]here [was] no indication that he exerted any control over the vehicle after giving Janulewicz the money." Although the court noted that "under the terms of the policy * * * Curley's permissive use of the vehicle is relevant only if James H. was the owner of the car," it nevertheless reached the issue of permissive use. Somewhat inconsistently with its observation that James H. had not exerted any control over the vehicle, the Appellate Division concluded that there was "no proof in this case that James H. gave actual permission to Curley to operate the vehicle on a public highway." Finding that such permission

could not be implied based on the circumstances, the court held that the policy did not afford coverage.

## II

Under the terms of the policy, Curley is covered for liability arising out of the accident if he "us[ed] with [James H.'s] permission a covered auto [James H.] own[ed]." We first address whether James H. owned the Cadillac.

## A

INA initially argues that because Janulewicz left the name of the buyer blank on the Certificate of Ownership, he did not effectively transfer title to the Cadillac and therefore plaintiffs must turn to Janulewicz and his insurance carrier for coverage. INA points to *Eggerding v. Bicknell*, 20 *N.J.* 106, 118 *A.*2d 820 (1955), in which an automobile dealership provided a defendant, Albert Bicknell, with a Certificate of Ownership for a used Chrysler after receiving the full purchase price, but failed to insert the date of the transaction or the name of the buyer as required by the Motor Vehicle Certificate of Ownership Law, (Certificate of Ownership Law), *N.J.S.A.* 39:10–1 to –37, and the regulations promulgated by the Director of the Division of Motor Vehicles thereunder. Before the paperwork had been completed, Bicknell struck and injured the plaintiff while operating the Chrysler. After the plaintiff had been awarded a $15,000 judgment against Bicknell, Bicknell brought an action seeking coverage against the automobile-dealer's insurance carrier. The Court found coverage, reasoning that the dealer's failure to follow the statutory requirements for transferring title, which require strict compliance, prevented the transfer of ownership of the car. *Eggerding, supra,* 20 *N.J.* at 112, 118 *A.*2d 820; *see also Velkers v. Glens Falls Ins. Co.,* 93 *N.J.Super.* 501, 226 *A.*2d 448 (Ch.Div.) (holding that person who traded in car to dealer, but provided incomplete Certificate of Ownership, remained owner of vehicle and therefore his insurer provided coverage for liability arising from accident involving his

son, who had been driving trade-in vehicle after initial exchange because newly purchased vehicle required repairs), *aff'd o.b.*, 98 *N.J.Super.* 166, 236 *A.*2d 408 (App.Div.1967), *certif. denied*, 51 *N.J.* 388, 241 *A.*2d 7 (1968); *Martin v. Nager*, 192 *N.J.Super.* 189, 199, 469 *A.*2d 519 (Ch.Div.1983) (noting that common thread in *Eggerding, supra*, and *Velkers, supra*, "is that the courts were looking to the title owner to find insurance coverage").

On the record before us, it would appear that Janulewicz remained the record owner of the Cadillac because "the incomplete assignment did not legally serve to transfer title from [Janulewicz] to [James H.]." *Eggerding, supra*, 20 *N.J.* at 112, 118 *A.*2d 820 (citing *N.J.S.A.* 39:10–2, –5, –9). Despite that conclusion, INA is not necessarily absolved from liability because, for insurance-coverage purposes, there may be more than one "owner" of a vehicle. Under our cases, "the true owner of an automobile may be one other than the holder of legal title to that vehicle." *American Hardware Mut. Ins. Co. v. Muller*, 98 *N.J.Super.* 119, 129, 236 *A.*2d 182 (Ch.Div.1967), *aff'd o.b.*, 103 *N.J.Super.* 9, 246 *A.*2d 493 (App.Div.), *certif. denied*, 53 *N.J.* 85, 248 *A.*2d 437 (1968).

In *Muller*, Ernest Muller, an automobile dealer, purchased a Ford Cortina but could not obtain financing. He therefore transferred title to the vehicle to his son, David Muller, who was able to finance the car. Ernest, however, made the loan payments and maintained control of the vehicle. The vehicle was used at Ernest's business "primarily for demonstration, display and advertisement purposes," *id.* at 122–23, 236 *A.*2d 182, although occasionally Ernest, and with Ernest's permission, David and David's wife, Donna Lee, used the car for personal reasons. Donna Lee was involved in an accident while driving the vehicle and sought coverage under Ernest's garage liability policy.

The court framed the issue as

whether transfer of the legal title of the station wagon by Ernest Muller to his son David for the sole purpose of financing that automobile, is sufficient under the applicable law to preclude Ernest from being the true owner of the automobile and

thus bringing it under the insurance policy issued to him by [the] insurance company.

[*Id.* at 124, 236 *A*.2d 182]

The court reasoned that the Certificate of Ownership Law did not "change[ ] the common law concept and meaning of the term 'owner.' " *Id.* at 128, 236 *A*.2d 182; *see also Dobrolowski v. R.C. Chevrolet, Inc.,* 227 *N.J.Super.* 412, 415, 547 *A*.2d 735 (Law Div.1988) ("Although the motor vehicle laws state that the owner of a vehicle is the person who holds the legal title of a vehicle, case law holds that the true owner of an automobile may be one other than the holder of legal title." (citation omitted)). Because "the vehicle was purchased, paid for and maintained by Ernest Muller," *Muller,* 98 *N.J.Super.* at 127, 236 *A*.2d 182, "Ernest Muller was the true owner of the station wagon," *id.* at 128, 236 *A*.2d 182, and therefore the court found that Ernest's policy provided coverage for liability arising from Donna Lee's accident, "notwithstanding the fact that legal title was in David Muller." *Ibid.*

■ Despite the lack of legal title, the true owner is the person who maintains "possession and control of the automobile." *Bohannon v. Aetna Casualty & Sur. Co.,* 166 *Cal.App.*3d 1172, 212 *Cal.Rptr.* 848, 850 (1985); *see also Hicks v. W.W. Land,* 117 *So.*2d 11, 12 (Fla.Dist.Ct.App.) (noting that beneficial owner of vehicle is person who has "control and authority over its use"), *cert. denied,* 120 *So.*2d 617 (Fla.1960); *Pagel v. Eckman,* 428 *N.W.*2d 136, 139 (Minn.Ct.App.1988) (finding beneficial ownership where title owner "had relinquished all control over the vehicle prior to the accident"); 73 *C.J.S. Property* § 25, at 204, 207 (1983) ("[A]n 'owner' is one who has dominion over property [that] is the subject of ownership[,]" including "the person in control of a vehicle, either mediately or immediately, and not the literal and technical owner."). More specifically, the Supreme Court of Washington, addressing an analogous issue—whether the true owner of a car was an unemancipated minor or his parents—noted the following factors to consider:

(a) Who paid for the car, (b) who had the right to control the use of the car, (c) the intent of the parties who bought and sold the car, (d) the intent of the parents

and the child relative to ownership, (e) to whom did the seller make delivery of the car, (f) who exercised property rights in the car from the date of its purchase to the date of the accident, and (g) any other circumstantial evidence [that] may tend to establish the fact of ownership.

[*Coffman v. McFadden*, 68 *Wash.*2d 954, 416 *P.*2d 99, 102 (1966).]

In finding that James H. was not the true owner, the Appellate Division noted that Janulewicz had understood that James H. was purchasing the vehicle "for a relative," that James H. had never considered himself to be the owner of the vehicle, that Curley had understood that James H. had to deal with Janulewicz to consummate the sale, that James H., after purchasing the vehicle from Janulewicz, had turned over the keys and Certificate of Ownership to Curley, and that James H. had not exerted control over the vehicle after that point. In effect, INA contends that the most accurate characterization of the transaction is that of an immediate transfer of ownership from James H. to Curley, subject only to Curley's obligation to repay James H.

A contrasting view of the transaction initially focuses on the fact that while Janulewicz understood that James H. was purchasing the car "for a relative," when asked whether he sold the car to that relative, Janulewicz testified, "I sold it to [James H.] and then he took it from there." Thus, despite Janulewicz's understanding of what James H. intended to do with the Cadillac, Janulewicz dealt only with James H. and sold the car to James H.

We note that the Cadillac remained on the Throckmorton lot for two-and-one-half weeks prior to the accident, and Curley and James H. did not anticipate insuring and registering the Cadillac in Curley's name until the day after the accident. Explaining the reason for that delay, James H. testified that "Curley didn't have money to pay me for the car. Plus the fact he didn't have money to get the car registered." James H.'s testimony implies that he retained the authority to impose on Curley the condition that he could not take title and insure the vehicle until he had paid James H. The record demonstrates that although James H. purchased the vehicle for Curley, James H. intended to retain effective control over the vehicle until he was paid.

The testimony on the issue of ownership was inconsistent at best. For example, during depositions James H. stated that the car was Curley's, and at trial James H. testified in response to a question asking whether he had purchased the car: "We got the car.... We paid the guy for the car. And Curley was suppose[d] to pay me back." Furthermore, Curley testified that at the time of the accident he had been "in the process of buying" the car, but that he had "never signed anything." When Curley was asked whether he had "ever pa[id] any money on account of the car," he responded that he had "never put any money on it."

The testimony supports the conclusion that James H. and Curley were indifferent to the technical questions about title and ownership. But their clear understanding was that James H. would maintain ultimate control and authority over the vehicle until Curley paid him back. Presumably, by the day after the accident, Curley would have secured the cash necessary to pay James H. and register the car. Neither of those events, however, came to pass. Accordingly, although James H. unquestionably had purchased the car with the intention of turning it over to Curley, we conclude that at the time of the accident James H. was the owner of the Cadillac.

B

We next address whether, within the context of the INA policy provision, Curley was using the Cadillac with James H.'s permission at the time of the accident. In *Mattis v. Nationwide Mutual Insurance Co.*, 33 *N.J.* 488, 496–97, 166 *A.2d* 345 (1960), this Court adopted the so-called "initial permission" rule, which provides

> that if a person is given permission to use a motor vehicle in the first instance, any subsequent use short of theft or the like while it remains in his possession, though not within the contemplation of the parties, is a permissive use within the terms of a standard omnibus clause in an automobile liability insurance policy.

The Court declined to adopt the "minor deviation" rule, which provides "that the permittee is covered under the omnibus clause so long as his deviation from the permissive use is minor in

nature" or the "conversion" rule, which states "that any deviation from the time, place or purpose specified by the person granting permission is sufficient to take the permittee outside the coverage of the omnibus clause." *Id.* at 493, 166 *A.*2d 345. The Court reasoned that the initial-permission rule, which represented the broadest interpretation of the clause at issue, "best effectuates the legislative policy of providing certain and maximum coverage." *Id.* at 496, 166 *A.*2d 345. The narrower rules "render coverage uncertain in many cases, foster litigation as to the existence or extent of any alleged deviations, and ultimately inhibit achievement of the legislative goal." *Ibid.*

"Under the initial permission rule only two questions must be answered to determine coverage. Was there permission to use the car initially? Did the subsequent use, while possession was retained, constitute 'theft or the like?' " *Small v. Schuncke,* 42 *N.J.* 407, 413, 201 *A.*2d 56 (1964).

Addressing the first question, we note that "the scope of the term 'use' is broad," covering a wide variety of activity other than operating a vehicle on a public roadway. *Motor Club Fire & Casualty Co. v. New Jersey Mfrs. Ins. Co.,* 73 *N.J.* 425, 436, 375 *A.*2d 639, *cert. denied,* 434 *U.S.* 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977); *see Indemnity Ins. Co. of N. Am. v. Metropolitan Casualty Ins. Co.,* 33 *N.J.* 507, 513, 166 *A.*2d 355 (1960) ("The *use* of an automobile denotes its employment for some purpose of the user; the word *"operation"* denotes the manipulation of the car's controls in order to propel it as a vehicle. *Use* is thus broader than *operation."*).

We note that after purchasing the vehicle James H. turned over the keys to Curley and observed him performing repairs on the vehicle. That conduct demonstrates that James H. implicitly granted Curley permission to work on the car while it remained on the Throckmorton lot, rendering Curley a permissive user of the Cadillac. *See Selected Risks Ins. Co. v. Nationwide Mut. Ins. Co.,* 133 *N.J.Super.* 205, 216, 336 *A.*2d 24 (App.Div.1975) (finding that examination of insured's vehicle by garage owner was permitted

use); *Unsatisfied Claim & Judgment Fund Bd. v. Clifton,* 117 *N.J.Super.* 5, 9, 283 *A.*2d 350 (App.Div.1971) (concluding that gas-station employee's repairing of insured's car was permitted use); *Liberty Mut. Ins. Co. v. O'Rourke,* 122 *N.J.Super.* 68, 75, 298 *A.*2d 725 (Ch.Div.1973) (holding that repair activity conducted by two men assisting driver in stalled vehicle was permitted use under driver's policy).

The Appellate Division, instead of focusing on whether the initial use of the Cadillac was permissive, addressed whether James H. had granted "permission to Curley to operate the vehicle on a public highway." However, because we have determined that James H. gave Curley permission to repair the vehicle, that line of inquiry is not determinative. The initial-permission rule "is not concerned with the scope of use for which permission is granted." *Small, supra,* 42 *N.J.* at 413–14, 201 *A.*2d 56. "[A]s long as the initial use of the vehicle is with the consent, express or implied, of the insured, any subsequent changes in the character or scope of the use, such as from a passenger to a driver, do not require the additional specific consent of the insured." *Motor Club, supra,* 73 *N.J.* at 437, 375 *A.*2d 639; *see Mattis, supra,* 33 *N.J.* 488, 166 *A.*2d 345 (holding that initial permission was not vitiated where person with permission to use neighbor's automobile to visit her ill mother deviated from that purpose by visiting several taverns); *Indemnity Ins. Co., supra,* 33 *N.J.* 507, 166 *A.*2d 355 (finding coverage where employee of wholesale-beer distributor, who had been instructed by employer that only he was to operate employer's car, allowed customer to drive car when returning from sales-promotion-program visit to brewery because car was being used for purpose permitted by employer); *Small, supra,* 42 *N.J.* 407, 201 *A.*2d 56 (holding that initial permission was not vitiated where owner permitted nephew to use his automobile to assist owner's wife, and nephew deviated from that purpose by picking up hitchhikers, traveling overnight to New York with automobile, and allowing friend to drive); *Odolecki v. Hartford Accident & Indem. Co.,* 55 *N.J.* 542, 264 *A.*2d 38 (1970) (holding that initial permission was not vitiated where owner permitted

only her son to use automobile, and son deviated from that purpose by allowing friend to use vehicle to pick up his girl friend); *Motor Club, supra,* 73 *N.J.* 425, 375 *A.*2d 639 (holding that initial permission was not vitiated where mentally disturbed passenger forced driver/owner from vehicle and proceeded to operate vehicle). Thus, although James H. never gave Curley permission to operate the Cadillac on a public highway, Curley's operation of the car, unless it amounts to "theft or the like," remained a coverable permissive use.

We note that the initial-permission rule "contemplates a situation in which the subsequent use of a car may be inconsistent with and even frustrate the intentions and plans of the person granting permission." *Small, supra,* 42 *N.J.* at 414–15, 201 *A.*2d 56. The breadth of the rule is designed to assure "that all persons wrongfully injured have financially responsible persons to look to for damages" because "a liability insurance contract is for the benefit of the public as well as for the benefit of the named or additional insured." *Odolecki, supra,* 55 *N.J.* at 549, 264 *A.*2d 38.

The only question remaining is whether James H.'s use of the vehicle constituted "theft or the like." The Court has reasoned that "the 'theft' component of the exception connotes nothing less than the willful taking of another's car with the intent permanently to deprive the owner of its possession and use." *Motor Club, supra,* 73 *N.J.* at 438, 375 *A.*2d 639. With respect to the "or the like" language, faced with the bizarre factual context in *Motor Club* involving a mentally disturbed passenger forcing the driver from a vehicle and taking over operation of the automobile, the Court stated that "the author of *Mattis* and *Small* contemplated conduct much more like traditional theft than the conduct here involved." *Ibid. But see id.* at 442–43, 375 *A.*2d 639 (Clifford, J., dissenting) (interpreting "or the like" to constitute "an unlawful taking" less than traditional theft and concluding that unauthorized seizure of vehicle satisfied that standard).

Here, the record clearly demonstrates that Curley did not intend to steal the car. Curley testified that he had driven the car

because he "was in the process of buying it" and "wanted to try it and see how it operates and everything." Moreover, although Curley was not authorized by James H. to use the dealer plates or to drive the car, his actions do not approach the unlawful seizure that occurred in *Motor Club*. James H. gave Curley the keys to the vehicle and permitted Curley to perform repairs while the vehicle remained on the Throckmorton lot. Curley was to have taken title to the vehicle the day after the accident occurred. Although Curley's actions deviated from the initial permission granted by James H., they were not so inconsistent with the understanding of the parties to rise to the level of "theft or the like."

## III

The judgment of the Appellate Division is reversed.

POLLOCK, J., dissenting.

Defendant James Curley Pierce (Curley) lived and worked at a gas station owned by his cousin, James H. Pierce (James H.). Curley caused an automobile accident resulting in the death of Sherry Ann Price and injuries to Robert Verriest. INA Underwriters Company (INA) insured James H. through a business-automobile policy. Curley is uninsured and judgment-proof. Verriest and Mary C. Price, as General Administratrix and Administratrix ad Prosequendum of the estate of Sherry Ann Price, have sued Curley, James H., and INA.

The majority concludes that INA is liable because James H. was the "true" owner of the car and Curley used the car with James H.'s permission. In my opinion, the record does not justify either conclusion. I would affirm the judgment of the Appellate Division granting summary judgment for INA.

## I

Ordinarily, the party liable for injuries caused by the permissive use of a motor vehicle is the record holder of title. In limited

circumstances, the true owner of a motor vehicle also may be liable for purposes of providing insurance coverage. *American Hardware Mut. Ins. Co. v. Muller*, 98 *N.J.Super.* 119, 236 *A.*2d 182 (Ch.Div.1967), *aff'd o.b.*, 103 *N.J.Super.* 9, 246 *A.*2d 493 (App.Div.), *certif. denied*, 53 *N.J.* 85, 248 *A.*2d 437 (1968). From my reading of the record, James H. was neither the legal nor the true owner of the car. The facts are crucial.

James H. owned Throckmorton Texaco Corp. (Throckmorton), which was in the business of washing and waxing cars. Three weeks before the accident, Curley started working for Throckmorton. A few days after Curley started working, he agreed to buy a 1974 Cadillac from Charles Janulewicz. James H. agreed to lend Curley the purchase price. Accordingly, James H. paid Janulewicz, and Curley agreed to repay James H. On receiving payment, Janulewicz gave James H. the keys and the title to the car. Aware that James H. was paying on behalf of another, Janulewicz did not enter James H.'s name on the certificate of ownership. James H. immediately turned over both the keys and the title to Curley.

During the two and a half weeks before the accident, the unregistered and uninsured Cadillac remained on the Throckmorton lot. Curley kept the keys and worked on the car. James H. arranged for Curley to meet with James H.'s insurance agent, so Curley could obtain insurance. The meeting was scheduled for the Monday after the accident.

When James H. left to attend a funeral in Florida, he gave Curley the keys to the gas station. In James H.'s absence, Curley opened a locked drawer in James H.'s office and removed dealer license plates registered to D'Amico Lincoln Mercury, which is not a defendant in this action. Curley knew that he was not authorized to use the plates. Nonetheless, he affixed them to the Cadillac. While driving the car, Curley caused the accident.

INA had issued to James H. an insurance policy that provided coverage for damages resulting from the permitted use of any automobile owned by him. *See ante* at 405–07, 662 *A.*2d at 969.

In determining that James H. owned the Cadillac, the majority concludes that James H. and Curley agreed that "James H. would maintain ultimate control and authority over the vehicle until Curley paid him back." *Ante* at 411, 662 *A.*2d at 972. It draws that conclusion from James H.'s explanation that the car was not registered and insured before the accident because "Curley didn't have money to pay me for the car. Plus the fact he didn't have money to get the car registered." *Ante* at 410, 662 *A.*2d at 971.

I view the facts differently. By transferring to Curley the certificate of title and the keys, James H. also transferred effective control over the car. *See American Hardware Mut. Ins. Co., supra,* 98 *N.J.Super.* 119, 236 *A.*2d 182 (individual who primarily used and maintained vehicle deemed true owner for insurance purposes, even though owner of record and his wife occasionally used vehicle). I can find no case—and the majority cites none—in which someone who was not the registered owner of the car, who never intended to own it, who possessed neither the certificate of title nor the keys, and who never used the car, has been held to be the owner. It seems to me that the majority's conclusion that James H. was the true owner of the car is an emotional response to a tragic set of facts. Compassion has a vital role in the law. But, for me, so tortured a reading of the facts exceeds the bounds of fairness and reason. Consequently, I would find that James H. was not the owner of the car.

## II

I also disagree with the majority's conclusion that Curley used the car with James H.'s permission. In disagreeing, I recognize that any use of a vehicle following an initial permissive use, "short of theft or the like," is deemed permitted for purposes of determining insurance coverage. *Matits v. Nationwide Mut. Ins. Co.,* 33 *N.J.* 488, 496–97, 166 *A.*2d 345 (1960). I also recognize that courts define "use" broadly. *Motor Club Fire & Casualty Co. v. New Jersey Mfrs. Ins. Co.,* 73 *N.J.* 425, 436, 375 *A.*2d 639, *cert.*

*denied,* 434 U.S. 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977); *Indemnity Ins. Co. of N. Am. v. Metropolitan Casualty Ins. Co.,* 33 *N.J.* 507, 513, 166 *A.*2d 355 (1960).

Too facile for me, however, is the majority's conversion of Curley's acts of ownership into evidence of James H.'s permission to use the car. The majority writes:

> We note that after purchasing the vehicle James H. turned over the keys to Curley and observed him performing repairs on the vehicle. That conduct demonstrates that James H. implicitly granted Curley permission to work on the car while it remained on the Throckmorton lot, rendering Curley a permissive user of the Cadillac.

> [*Ante* at 412, 662 *A.*2d at 972.]

I suggest that the only sensible reading of the record is that James H. turned over the keys to Curley for precisely the same reason that Curley worked on the car—the car belonged to Curley.

Accepting, however, the majority's conclusion that James H. "permitted" Curley to "use" the car by working on it, that limited permission should not lead to the further conclusion that Curley's operation of the car on the public highway also was permitted. The majority cites several cases in which this Court has found liability under an owner's insurance policy although the insured vehicle was used in a manner inconsistent with the initial permission. *Matits, supra,* 33 *N.J.* 488, 166 *A.*2d 345 (holding that driving to several taverns did not vitiate initial permission to use vehicle to visit operator's sick mother); *Indemnity Ins. Co., supra,* 33 *N.J.* 507, 166 *A.*2d 355 (finding coverage when wholesale-beer distributor's employee allowed customer to drive car while returning from sales promotion program to visit brewery); *Small v. Schuncke,* 42 *N.J.* 407, 201 *A.*2d 56 (1964) (holding that initial permission was not vitiated when owner permitted nephew to use his automobile to assist owner's wife, and nephew picked up hitchhikers and allowed them to drive); *Odolecki v. Hartford Accident & Indem. Co.,* 55 *N.J.* 542, 264 *A.*2d 38 (1970) (holding that owner's son did not vitiate initial permission by allowing friend to use vehicle to pick up his girl friend); *Motor Club, supra,*

73 *N.J.* 425, 375 *A.*2d 639 (holding that initial permission was not vitiated when mentally-disturbed passenger operated vehicle after expelling owner).

In all of those cases, both the initial use and the subsequent use involved the operation of the car. The deviation in the subsequent use involved a change in the route, the time of operation, or in the identity of the driver or passengers. In no case cited by the majority has a court converted permission for a strictly non-operational purpose into permission for a subsequent use involving operation of the vehicle.

Twenty-five years ago, in *State Farm Mutual Automobile Insurance Co. v. Travelers Insurance Co.*, 57 *N.J.* 174, 270 *A.*2d 625 (1970), this Court extended coverage to an automobile dealer's employee who drove a customer's car when the dealer had permitted the employee to test drive the car in connection with certain repairs. The Court stated that "[s]ince it was undenied that [the owner] acquiesced in [the salesman's] use of the car, any subsequent use thereof for his own purposes would still be within the initial permission. Once the permission was given, the scope of that permission was unrestrictable." *Id.* at 178, 270 *A.*2d 625. Even in that case, however, the initial permission included authority to operate the vehicle.

If James H. is deemed the true owner, a conclusion with which I disagree, he did no more than permit Curley to work on the car while it remained on the Throckmorton lot. Such limited authorization hardly justifies the imposition of risks associated with the operation of the car. In sum, the majority's conclusion that James H. permitted Curley to operate the car represents an unprecedented and unjustified extension of the initial permission rule.

I reach that conclusion notwithstanding the proposition that only "theft or the like" will terminate initial permission to use the vehicle. *Small, supra,* 42 *N.J.* at 413, 201 *A.*2d 56; *Matits, supra,* 33 *N.J.* at 495, 166 *A.*2d 345; *Motor Club, supra,* 73 *N.J.* at 433, 375 *A.*2d 639. To disagree with the majority, I need not go so far as so respected an authority as Appleman, who characterizes the

New Jersey decisions as unbelievable and "strange." Appleman writes:

> Unbelievably however New Jersey even has held that as long as the initial use of a vehicle is with the consent, express or implied, of the insured, any subsequent changes in the character or scope of use, such as from a passenger to a driver, do not require the additional specific consent of the insured; only where deviation from the use consented to amounts to "theft or the like" will the coverage be precluded under the insured's policy.

> Following the same strange desire to award a converter, New Jersey has held that the "theft" components of "theft or the like" exception to the "implied permission" rule regarding coverage under an omnibus clause of an automobile liability policy connotes nothing less than the wilful taking of another's car with the intent permanently to deprive the owner of its possession and use.

> [6C John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 4366 (Supp.1994) (criticizing *Motor Club* ).]

A fair reading of the initial-permission rule should deny coverage in this case. On the assumption that James H. was the owner, Curley's operation of the vehicle is so inconsistent with James H.'s limited authorization to work on it as to be tantamount to "theft or the like." *See Motor Club, supra,* 73 *N.J.* at 442–43, 375 *A.*2d 639 (Clifford, J., dissenting) (construing "or the like" to mean something less than theft).

I would affirm the judgment of the Appellate Division.

GARIBALDI, J., joins in this dissent.

*For reversal*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN and COLEMAN—4.

*For affirmance*—Justices POLLOCK and GARIBALDI—2.