835 A.2d 309

JACQUELINE JAQUEZ, PLAINTIFF, v. NATIONAL CONTINEN-
TAL INSURANCE COMPANY, DEFENDANT AND THIRD PAR-
TY PLAINTIFF–RESPONDENT, AND EDGAR LOPERENA,
CARLOS RIBOT, ERICA ROCHESTER, C AND S AUTO SALES
AND JOHN DOES 1 THROUGH 10 (FICTITIOUS PARTIES),
DEFENDANTS, v. STATE FARM INDEMNITY COMPANY,
THIRD PARTY DEFENDANT–APPELLANT.

Argued October 20, 2003—Decided November 26, 2003.

*Peter DeSalvo, Jr.,* argued the cause for appellant (*Soriano, Henkel, Salerno, Biehl & Matthews,* attorneys).

*Thomas J. Decker* argued the cause for respondent (*Decker & Magaw,* attorneys).

Justice VERNIERO delivered the opinion of the Court.

This is an insurance coverage case. As more fully set forth below, the insured drove her car to the home of her boyfriend's sister. When the insured reached that destination she locked the car after parking it on the street in front of the residence. Once inside the house, she gave her car keys to her boyfriend's nephew to retrieve a pack of cigarettes that she kept in the vehicle. Without the insured's knowledge, the nephew then drove the car and was involved in an accident. The question presented is whether, under those circumstances, a reasonable fact-finder could conclude that the nephew was the car's "permissive user" for purposes of coverage under the insured's liability policy. We hold that the answer to that question is no.

I.

These are the undisputed facts, derived largely from the deposition testimony and certification of the insured, Erica Rochester. On March 17, 1999, Rochester drove her automobile to the New-

ark home of her boyfriend's sister, Mildred (whose last name is not in the record). Prior to that date, Rochester had visited Mildred's house about three times a month. In this case, while inside the residence, Rochester and Mildred conversed for a few minutes, and Rochester also said hello to Carlos Ribot, Mildred's son.

At some juncture Ribot asked Rochester for a cigarette. According to Rochester, she usually kept her cigarettes in her pocket or in the console of her car. Rochester testified at her deposition that her conversation with Ribot consisted of the following: "He asked me, 'Erica, do you have a cigarette?' I said, 'No. They're in the car.' I said, 'If you want to, here's the keys. You can get them out of the car.' He said, 'Okay, I'll be right back.' " That testimony is consistent with Rochester's certification in which she states:

> At no time prior to my giving Mr. Ribot the keys to my car did he ever ask my permission to drive my car. Based upon my discussion with Mr. Ribot, the only understanding that I had at the time was that I was giving him the keys to my car so that he could get the cigarettes that were in the car and return to the house with the keys to my car.

Based on their brief conversation, Rochester gave Ribot the keys to the car. Rather than return with the cigarettes, Ribot drove Rochester's car and was involved in an accident, colliding with another car driven by Edgar Loperena. Jacqueline Jaquez was a passenger in Loperena's car. Loperena later told the police that his car had been struck from the rear at a high rate of speed by Ribot, forcing the Loperena vehicle onto the sidewalk.

Meanwhile, sometime after Rochester had given Ribot the keys, Mildred noticed that the vehicle was missing and screamed, "Erica, where is your car?" In response, Rochester ran downstairs to look out onto the street. When she saw that her car was not where she had parked it, Rochester called the police to report it stolen. While Rochester was speaking to the police, a flatbed truck arrived at Mildred's house with Rochester's car. A few minutes later, another police officer drove to the house with Ribot. According to Rochester, she did not talk with Ribot for about two

years after the incident. When she finally did speak with him, Ribot apologized but apparently never indicated where he was going with the car or why he took it, other than saying "that he was all fed up." Ribot submitted no deposition testimony or certification in this case.

At the time of the collision, National Continental Insurance Company (National) insured the vehicle driven by Loperena, and State Farm Indemnity Company (State Farm) insured Rochester's vehicle. Loperena and Jaquez instituted separate actions against Ribot, Rochester, and National. Those suits eventually were consolidated. State Farm denied coverage on the ground that Rochester had not given Ribot permission to use the car, thereby excluding it from the omnibus liability clause of Rochester's policy. Loperena and Jaquez then sought uninsured motorist coverage from National. National settled those claims (apparently for $17,500 each) and instituted a third-party complaint against State Farm, alleging that State Farm wrongfully had denied coverage.

National moved for summary judgment and State Farm cross-moved for the same disposition. Based in part on Rochester's certification, the trial court denied National's motion and granted State Farm's motion. The court held that no reasonable fact-finder could conclude that Rochester (as State Farm's insured) had granted Ribot permission to use the car on the record presented. The court stated:

> There is no suggestion or any implication of any permission of any use of the vehicle of any kind whatsoever beyond the retrieval of the cigarettes.... [T]he report of the stolen vehicle is a further confirmation of the permitter's permission being restricted and limited to the retrieval of the cigarettes and not certainly at all to its operation or its removal [from] the place in which it was found.
>
> Further, there is no implication that can be drawn from [Ms.] Rochester's certification of an expressed or permissive use simply by the handing over of the keys under the fact pattern presented. There is no reasonable inference that can be drawn from the evidence before the Court, even most favorably drawn, of any implicit suggestion of the operation of the vehicle on the part of Ribot based either on expressed, inferential or circumstantial evidence.

The Appellate Division reversed in a reported opinion. *Jaquez v. National Cont'l Ins. Co.*, 356 *N.J.Super.* 260, 812 A.2d 385

(2002). The panel noted preliminarily that Rochester had given Ribot permission to retrieve the cigarettes from the car. Consistent with its view of the relevant case law, the panel then concluded that because Rochester had so acted, only a subsequent theft of the car by Ribot would have provided grounds to consider him a non-permissive user. Because it found insufficient facts to support theft or the like, the Appellate Division held that State Farm is required to provide coverage under Rochester's policy. We granted State Farm's petition for certification, 176 *N.J.* 71, 819 *A.*2d 1187 (2003), and now reverse.

## II.

■ Every owner of an automobile registered in New Jersey is required to maintain liability insurance coverage. *N.J.S.A.* 39:6B–1. Although the law contains no statutory limitation on coverage based on permitted use, courts traditionally apply the "initial-permission rule" when evaluating omnibus liability clauses of the kind at issue here. *Rutgers Cas. Ins. Co. v. Collins,* 158 *N.J.* 542, 548, 730 *A.*2d 833 (1999). Adopted over forty years ago, the initial-permission rule provides that

> if a person is given permission to use a motor vehicle in the first instance, any subsequent use short of theft or the like while it remains in his possession, though not within the contemplation of the parties, is a permissive use within the terms of a standard omnibus clause in an automobile liability insurance policy.
>
> [*Matits v. Nationwide Mut. Ins. Co.,* 33 *N.J.* 488, 496–97, 166 *A.*2d 345 (1960).]

Courts have held that a nearly unlimited range of conduct on the part of a driver or passenger, "short of outright theft [of the vehicle,] is within the scope of an insured's or owner's permission." Cynthia M. Craig & Daniel J. Pomeroy, *New Jersey Auto Insurance Law* § 6:3–5 at 135 (2003). The rationale behind the rule's expansive treatment is to avoid the uncertainty in coverage that might result from having to litigate the scope of an owner's initial permission in every case. *Matits, supra,* 33 *N.J.* at 496, 166 *A.*2d 345. This Court more fully has explained:

> The initial-permission rule is not concerned with the scope of use for which permission is granted. [A]s long as the initial use of the vehicle is with the

consent, express or implied, of the insured, any subsequent changes in the character or scope of the use, such as from a passenger to a driver, do not require the additional specific consent of the insured.

. . . .

> We note that the initial-permission rule contemplates a situation in which the subsequent use of a car may be inconsistent with and even frustrate the intentions and plans of the person granting permission. The breadth of the rule is designed to assure that all persons wrongfully injured have financially responsible persons to look to for damages because a liability insurance contract is for the benefit of the public as well as for the benefit of the named or additional insured.
>
> [*Verriest v. INA Underwriters Ins. Co.*, 142 *N.J.* 401, 413–14, 662 *A.*2d 967 (1995) (first alteration in original) (internal quotation marks and citations omitted).]

■ Notwithstanding its broad application, the rule "does not extend to every use of a car." Craig & Pomeroy, *supra*, § 6:3–5 at 137. In *Nicholas v. Sugar Lo Co.*, the parents of an underage young man permitted him to operate their motor vehicle under their supervision on certain occasions. 192 *N.J.Super.* 444, 447–48, 471 *A.*2d 44 (App.Div.1983), *certif. denied*, 96 *N.J.* 284, 475 *A.*2d 582 (1984). On the first occasion, when he was twelve or thirteen years old, the son sat on his father's lap and steered the car at an airfield. On other occasions his parents permitted him to drive the car on the driveway of their home and at the airfield. His mother considered her son "to be a good driver but she did not permit him to drive on public roads." *Id.* at 447, 471 *A.*2d 44. The father likewise considered his son to be "a rather 'gifted' driver." *Id.* at 448, 471 *A.*2d 44.

Contrary to his parents' instruction that he not drive on any public road, the son, who was then only fourteen years old, "obtained the vehicle for use on the highway ... without the knowledge of his parents." *Id.* at 446, 452, 471 *A.*2d 44. On those facts, the Appellate Division found no insurance coverage, stating that "even though we liberally construe [a policy's] omnibus [liability] clause, we cannot find coverage here." *Ibid.* (internal citation omitted). The court further instructed:

> We do not suggest from our result that subsequent permission to use a vehicle could not be inferred from the granting of initial permission at different times. Thus it might well be reasonable to hold from a course of dealings between parties

that the continuous granting of permission to use a vehicle implied permission to use it without express consent on another occasion. But this is not that case. [*Id.* at 452–53, 471 *A*.2d 44.]

In other words, the user in *Nicholas* enjoyed neither the express nor implied permission of his parents to drive the car when his accident occurred on March 10, 1978. As for express permission, the facts revealed that he had breached his parents' directive that he not drive the vehicle on any public highway. In respect of implied consent, the court found that the prior occasions of supervised use were "so remote from the events of March 10, 1978 that the use on that day may not reasonably be regarded as being related to the earlier permission." *Id.* at 452, 471 *A*.2d 44. Thus, it was not a question whether the son had exceeded the scope of some initial permission; the court found that there was no permission to use the car at all on the date in question.

■ In sum, as reflected in the above case law, application of the initial-permission rule first requires a determination that the insured or owner had given initial permission to the non-insured to use the vehicle. To satisfy that first prong of the analysis, the permission can be either express or implied. *State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.,* 62 *N.J.* 155, 299 *A*.2d 704 (1973). If such permission is found, then the analysis shifts to a second question: "Did the subsequent use, while possession was retained, constitute 'theft or the like?' " *Verriest, supra,* 142 *N.J.* at 412, 662 *A*.2d 967 (internal quotation marks and citation omitted). If yes, then we consider the insured's initial consent to have been vitiated, and there is no coverage. *Id.* at 413, 662 *A*.2d 967.

### III.

■ Against that backdrop, the parties do not dispute that Rochester permitted Ribot to enter the automobile for the purpose of retrieving her cigarettes. The threshold question, then, is whether that purpose constitutes "use" of the vehicle within the reasonable contemplation of the initial-permission rule. The short answer is no. The trial court properly granted summary judg-

ment in favor of State Farm based on that court's correct observation that "[t]here is no suggestion or any implication of any permission of any use of the vehicle of any kind whatsoever beyond the retrieval of the cigarettes." In view of that conclusion, we need not determine whether Ribot's conduct constituted "theft or the like" under the rule's second prong.

■ We are not persuaded by National's contention that the concept of use is broad enough to encompass what occurred in this case. That said, we do not retreat from this Court's prior teachings that "[t]he *use* of an automobile denotes its employment for some purpose of the user; the word *'operation'* denotes the manipulation of the car's controls in order to propel it as a vehicle. *Use* is thus broader than *operation." Indemnity Ins. Co. of N. Am. v. Metropolitan Cas. Ins. Co.,* 33 *N.J.* 507, 513, 166 *A.*2d 355 (1960). Consistent with those teachings, "use" of an automobile generally falls within the rule's purview when such use is rationally connected to the vehicle for the purpose of providing transportation or satisfying some other related need of the user.

Here, Rochester gave permission to Ribot to unlock the car for the sole purpose of retrieving a pack of cigarettes. That purpose did not relate to a transportational or similar need of Ribot. Stated differently, Rochester did not permit Ribot, either expressly or impliedly, to "use" or "employ" the car at all; she merely gave him limited license to enter the parked vehicle to recover an item believed to be stored inside. We appreciate the subtlety of our analysis, namely, that there is a distinction to be drawn in this case between permission to retrieve an item from the vehicle and permission to use the car itself. Although this might be the first decision to implicate that distinction so clearly, we believe that it is an appropriate and valid distinction under the totality of circumstances.

In urging a contrary conclusion, National cites *Motor Club Fire & Casualty Co. v. New Jersey Manufacturers Insurance Co.,* 73 *N.J.* 425, 375 *A.*2d 639, *cert. denied,* 434 *U.S.* 923, 98 *S.Ct.* 402, 54 *L.Ed.*2d 281 (1977). In that case, the insured offered to drive her

neighbor and her neighbor's mentally disturbed adult son to a psychiatrist. Because she was unsure about the precise location of the psychiatrist's office, the insured decided to take a practice ride to that office prior to the appointment. The neighbor and son joined the insured for that purpose. *Id.* at 428–29, 375 *A.2d* 639.

While the insured was driving with both passengers in the front seat, the son suddenly climbed over his mother, grabbed the steering wheel, and ordered the insured "to get out of the car." *Id.* at 429, 375 *A.2d* 639. The insured, "stunned and frightened by [the son's] actions and expression, pressed down the emergency brake and exited from the driver's side onto a traffic island in the street." *Ibid.* The son then "succeeded in crawling across the front seat, took the wheel, and ... [a]lmost immediately, the automobile struck the rear of another car, went out of control, and crashed into an office building." *Ibid.*

In finding coverage under the insured's policy, this Court applied the initial-permission rule. *Id.* at 437, 439, 375 *A.2d* 639. We concluded that the first prong had been satisfied when the insured allowed the son the initial use of the vehicle as a passenger. *Id.* at 438, 375 *A.2d* 639. The remaining issue was whether the son's "ouster" of the insured from the car constituted a "theft or the like." *Ibid.* We stated that the "theft" component of the rule "connotes nothing less than the willful taking of another's car with the intent permanently to deprive the owner of its possession and use." *Ibid.*

As for "or the like," the Court observed that that phrase "contemplated conduct much more like traditional theft than the conduct here involved." *Ibid.* Accordingly, the Court held that the son's conduct neither vitiated the insured's consent to his use of the car, nor "deprive[d] him of the protection afforded by the omnibus clause of [the insured's] insurance policy." *Id.* at 439, 375 *A.2d* 639.

*Motor Club* is not without its critics. At its birth the decision drew a forceful two-member dissent written by Justice Clifford and joined by Justice Mountain. The dissenters suggested that

the majority's application of the initial-permission rule reflected a "straining of common language and suspension of reasoned analysis" that in turn had led to a "zany result[.]" *Id.* at 440, 375 *A.*2d 639 (Clifford, J., dissenting). The two justices, however, confined their disagreement to the second prong only, namely, whether the son's conduct had constituted a "theft or the like." *Ibid.* Justice Clifford interpreted "or the like" to mean conduct less than traditional theft and would have found that the son's unauthorized seizure of the car had satisfied that test. *Id.* at 442–43, 375 *A.*2d 639.

Assuming that *Motor Club* correctly concluded that the insured had given her initial consent to the user by allowing him to be a passenger, those circumstances are entirely lacking here. As already noted, at no time did Rochester invite Ribot to be a passenger in the car or to employ it in any manner. On that basis alone *Motor Club* is distinguishable and does not alter our disposition.

■ Notwithstanding that our decision here is based solely on the rule's first prong, we avail ourselves of this opportunity to express our current view of *Motor Club's* second-prong analysis. The user's sudden, forced removal of the insured from the vehicle in that case, coupled with the insured's "stunned and frightened" reaction, convinces us that the user's conduct constituted a "theft or the like." In short, we essentially agree with Justice Clifford's position, *id.* at 440–43, 375 *A.*2d 639, and no longer consider the majority's analysis to be controlling authority of the Court.

Our holding is also consistent with *Verriest, supra,* 142 *N.J.* 401, 662 *A.*2d 967. In that case, a person by the name of James Pierce (James) purchased a car for his cousin, James Curley Pierce (Curley), and maintained the car on a commercial lot. *Id.* at 403–04, 662 *A.*2d 967. Apparently Curley lacked the immediate funds to reimburse James for the car or to register it. *Id.* at 404, 662 *A.*2d 967. Nonetheless, James provided Curley with the keys to the car, and also "permitted Curley to perform repairs while the vehicle remained on the [ ] lot." *Id.* at 415, 662 *A.*2d 967.

Unbeknownst to James, Curley then drove the car "and collided head-on with a vehicle." *Id.* at 404–05, 662 *A.*2d 967. The collision occurred one day before Curley was scheduled to insure the vehicle. *Id.* at 404, 662 *A.*2d 967.

Curley indicated "that he had driven the car because he 'was in the process of buying it' and 'wanted to try it and see how it operate[d] and everything.' " *Id.* at 414–15, 662 *A.*2d 967. Based in part on that testimony, this Court concluded that James had granted initial permission to Curley to use the vehicle for purposes of the initial-permission rule. We reasoned

that after purchasing the vehicle James [ ] turned over the keys to Curley and observed him performing repairs on the vehicle. That conduct demonstrates that James [ ] implicitly granted Curley permission to work on the car while it remained on the [commercial] lot, rendering Curley a permissive user of the [car].

[*Id.* at 412, 662 *A.*2d 967.]

The facts in *Verriest*, particularly the fact that the vehicle's owner expected to transfer the car to the user, supported an inference of permissive use. That an intended buyer of an automobile would "try it and see how it operates" is well within the concept of use reasonably contemplated under the rule. But that also is not this case. Here, Ribot's intended act of retrieving cigarettes from Rochester's parked automobile bears no rational relationship to his driving that automobile as he ultimately did and for the reason he gave, "that he was all fed up." As a result, the record cannot sustain an inference of permissive use. We are confident in our belief that a contrary conclusion would represent an unreasonable extension of past decisions, without foundation in law or logic.

Similarly, National's reliance on another case, *Odolecki v. Hartford Accident & Indemnity Co.*, 55 *N.J.* 542, 264 *A.*2d 38 (1970), is misplaced. In that case, the mother of a teenage son gave him permission to use her automobile, but "[s]he also told him not to let anyone else drive the car." *Id.* at 544, 264 *A.*2d 38. The son thereafter permitted his friend to use the car and the friend was involved in an accident. *Ibid.* We held that once the insured initially had permitted her son to use the car, the son's subsequent

action in allowing his friend to drive it was not enough to remove the case from the scope of the initial-permission rule. *Id.* at 550, 264 *A*.2d 38.

Again, the present case is different. Unlike *Odolecki* or the other cases cited by National in which the non-insured merely exceeded his initial status as a permissive driver, passenger, repairer, or similar user, Ribot never was given permission to drive, park, ride in, repair, or otherwise employ Rochester's car for any related purpose. Ribot did not obtain such status in the first instance because Rochester gave him no permission whatsoever to "use" or "employ" her car as those terms reasonably are understood within the meaning of our existing jurisprudence.

■ Nor are we persuaded by the suggestion that the so-called "loading and unloading" cases require a finding that Ribot's intended retrieval of the cigarettes constituted a "use of the vehicle." Under those cases, "the concept of 'use of a vehicle' includes acts of loading and unloading the vehicle[.]" *Kennedy v. Jefferson Smurfit Co.,* 147 *N.J.* 394, 398, 688 *A*.2d 89 (1997). Fairly read for our purposes here, the cases stand for the proposition that when the "loading and unloading" action is related to the transportation of goods from one location to another, then it constitutes "use of a vehicle." *See, e.g., id.* at 401, 688 *A*.2d 89 (finding that selection of pallets part of "loading and unloading" process because pallets are used to "facilitate movement of goods"). In this case, the purpose of Rochester's car in respect of the cigarettes was storage, not transportation. Thus, Ribot's anticipated retrieval of them cannot reasonably be considered "use" of the vehicle.

We repeat that, other than expressing disapproval of *Motor Club,* we do not signal a retreat from the traditional operation of the initial-permission rule. We merely conclude that finding permissive use under the circumstances of this case would breach the rule's outer limits. "In the last analysis, our holding is compelled not only by a sensible application of prior case law, but by simple common sense." *Harleysville Ins. Cos. v. Garitta,* 170

*N.J.* 223, 241, 785 *A.*2d 913 (2001). From that perspective, we are persuaded that State Farm did not assume the risk of liability on the record presented and that the trial court properly entered summary judgment in favor of that insurer. See *id.* at 242, 785 *A.*2d 913 (upholding exclusion of insurance coverage on summary judgment in case in which "exclusion may be found as a matter of law, without further inquiry by a trier of fact").

## IV.

In sum, giving all favorable inferences to National, we discern no basis on which a reasonable trier of fact could find that Ribot's conduct amounted to permissive use. See *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995) (outlining standards for entering summary disposition against non-moving party). Accordingly, the judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for reinstatement of its prior disposition.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN, and WALLACE—7.

*Opposed*—None.